727 So.2d 216 (1998)
Arthur Dennis RUTHERFORD, Appellant,
v.
STATE of Florida, Appellee.
No. 89142.
Supreme Court of Florida.
December 17, 1998.
Rehearing Denied March 2, 1999.
*217 Gregory C. Smith, Capital Collateral Counsel, and Andrew Thomas, Chief Assistant CCCNorthern Region, Office of the Capital Collateral Counsel, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
Arthur Dennis Rutherford, an inmate under sentence of death, appeals the trial court's denial of relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1),(7), Fla. Const. For the reasons expressed below, we affirm.

I. PROCEDURAL STATUS
Rutherford, age 36 at the time of the crime, was charged with the 1985 murder and armed robbery of Stella Salamon. A jury found Rutherford guilty as charged and recommended death by a vote of eight to four; however, due to a discovery violation by the State, the trial court declared a mistrial.
On retrial, Rutherford was represented by John Jay Gontarek and William Treacy. Both Gontarek and Treacy (hereinafter both separately and collectively referred to as "trial counsel") were assistant public defenders, and neither represented Rutherford in his first trial.
The guilt-phase evidence at retrial included the fact that the victim's body was found in her bathtub, and that Rutherford's fingerprints and a palm print were found in the victim's bathroom. As detailed in the opinion on direct appeal:
The medical examiner testified that Mrs. Salamon's left arm was broken at the elbow and the upper part of the arm was bruised, that there were bruises on her face and cuts on her lip, and that there were three severe wounds on her head. Two of these injuries were consistent with having been made by a blunt instrument or by her head being struck against a flat surface; another was a puncture wound; and all were associated with skull fracture. Cause of death was by drowning or asphyxiation, evidence of both being present.
Two women testified that Rutherford had asked them to help him cash a $2,000 check, on which he had forged Mrs. Salamon's signature. Two other wit-nesses testified that before Mrs. Salamon's death Rutherford had told them that he planned to get some money from a woman by forcing her to write him a check. He said he would then kill her by hitting her in the head and drowning her in the bathtub to make her death look accidental. One witness quoted him as saying, "I can't do the time, but I'm damn sure gonna do the crime." Another witness testified that on the day of the murder Rutherford indicated he might kill Mrs. Salamon, and yet another witness said Rutherford told him later that day that he had killed "the old lady" by hitting her in the head with a hammer, and then had put her in the bathtub.
Rutherford v. State, 545 So.2d 853, 854-55 (Fla.1989).
The jury found Rutherford guilty as charged. At the penalty phase, in addition to other evidence, the State presented the testimony *218 of two witnesses that, on the day before her murder, the victim told them that she was fearful of Rutherford and wished he would stop coming by her house. Trial counsel did not object to this hearsay testimony.
In mitigation, trial counsel presented lay character testimony from Rutherford's family and a friend regarding his positive character traits such as being a good father, a hard worker, loyal, respectful, nonviolent, honest and generous. Testimony was also presented regarding Rutherford's meager upbringing, and the fact that his involvement in Vietnam had changed him in that he had become jittery and nervous, had nightmares, and experienced night sweats. Rutherford testified on his own behalf in the penalty phase that he did not commit the murder in question. He also testified regarding his military service, including his horrifying experiences in Vietnam and his numerous military commendations.
The jury recommended death by a vote of seven to five. The trial court imposed the death penalty, finding three aggravating factors: that the murder was heinous, atrocious or cruel ("HAC"); cold, calculated and premeditated ("CCP"); and committed during the course of a robbery/for pecuniary gain (merged). The trial court found only one statutory mitigator: that Rutherford had no significant history of criminal activity. The trial court considered, but did not find, any nonstatutory mitigating circumstances.
In his subsequent rule 3.850 motion, Rutherford challenged the lawfulness of his conviction and death sentence on a number of grounds.[1] In an initial order, the trial court summarily denied as procedurally barred all but four grounds involving ineffective assistance of counsel ("IAC"): IAC in the guilt phase for failing to investigate, prepare, and perform sufficiently; IAC in the penalty phase for failing to object to the hearsay testimony regarding the victim's fear of Rutherford; IAC in the penalty phase for failing to obtain a mental health expert for mitigation purposes; and IAC in the penalty phase for failing to investigate, prepare, and present substantial available mitigation. After an evidentiary hearing, the trial court denied relief on these IAC claims as well, detailing its analysis of the facts and applicable law in a twenty-nine-page order.

II. APPEAL
Rutherford now appeals, raising six issues: (1) whether trial counsel was ineffective for failing to object to the penalty-phase hearsay testimony of witnesses regarding the victim's fear of Rutherford; (2) whether trial counsel was ineffective for failing to procure and present expert mental health testimony in mitigation at the penalty phase; (3) whether trial counsel was ineffective in the penalty phase for failing to investigate, develop, and present substantial mitigating evidence regarding Rutherford's harsh childhood and Vietnam war experience; (4) whether the trial court erred in its initial order by summarily denying Rutherford's double jeopardy claim as procedurally barred; (5) whether trial counsel was ineffective in the guilt phase for failing to investigate, prepare, and perform sufficiently; and (6) whether the trial court erred in its initial order by summarily denying several of Rutherford's other claims as procedurally barred. We find issues four and six to be procedurally barred.[2] As to the *219 remaining issues that involve counsel's guilt-phase and penalty-phase performance, our review reveals no basis for reversing the trial court.

III. Strickland Analysis
In Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court recognized that the purpose of the constitutional requirement of effective assistance of counsel is "to ensure a fair trial." Applying this purpose "as the guide" in ineffective assistance of counsel cases, the Supreme Court elaborated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id.
The Court set forth a two-prong test for evaluating claims of ineffective assistance:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687, 104 S.Ct. 2052 (emphasis supplied).
In elaborating on the showing required to satisfy the second prong, the Court explained:

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. Respondent suggests requiring a showing that the errors "impaired the presentation of the defense." That standard, however, provides no workable principle. Since any error, if it is indeed an error, "impairs" the presentation of the defense, the proposed standard is inadequate because it provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding.

On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceedings. Moreover, it comports with the widely used standard for assessing motions for new trial based on newly discovered evidence. Nevertheless, the standard is not quite appropriate.
Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a *220 prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.
Id. at 693-94, 104 S.Ct. 2052 (citations omitted) (emphasis supplied).
According to these concerns and observations, the Court developed the following as the "appropriate test" for determining prejudice under prong two:
The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
Id. at 694, 104 S.Ct. 2052; see also Rose v. State, 675 So.2d 567, 569 n. 4. (Fla.1996). "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." Strickland, 466 U.S. at 698, 104 S.Ct. 2052.

IV. GUILT PHASE PERFORMANCE
As to issue five regarding guilt-phase ineffectiveness, we find no evidence presented at the evidentiary hearing that points to any deficiencies in counsel's guilt phase performance that would satisfy the first prong of Strickland. Regarding the two wit-nesses Rutherford claims would have corroborated his testimony that the money in his possession was from a legitimate source, and did not belong to the defendant, one witness did not even testify at the 3.850 hearing, and the other testified that he paid an uncertain sum to Rutherford by check some days prior to the murder. Trial counsel, in fact, testified that he interviewed a witness about a monetary transaction with Rutherford, but elected not to call him at trial because this witness felt Rutherford had cheated him. None of these matters refute the evidence of guilt presented by the State. There was overwhelming evidence of Rutherford's guilt. Even assuming any deficiency in trial counsel's guilt-phase performance, there is no reasonable probability, sufficient to undermine our confidence in the outcome, that the result of the proceeding would have been different. See Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995).

V. PENALTY PHASE PERFORMANCE
As to the penalty phase, to establish prejudice Rutherford must "demonstrate that counsel's performance was deficient and that counsel's deficient performance affected the outcome of the sentencing proceedings." Id. (citing Strickland, 466 U.S. at 694, 104 S.Ct. 2052). The demonstration of prejudice is made if "counsel's errors deprived [defendant] of a reliable penalty phase proceeding." Rose, 675 So.2d at 571 (alteration in original) (quoting Hildwin, 654 So.2d at 110).

A. Failure To Object To Hearsay Testimony
Rutherford first argues that his trial counsel was deficient for failing to object to the penalty-phase hearsay testimony regarding the victim's fear of Rutherford. Rutherford challenged the admissibility of this testimony on direct appeal, but this Court held that the issue had been waived. See Rutherford, 545 So.2d at 857. At the 3.850 hearing, trial counsel acknowledged that he probably should have objected to this testimony. In denying relief on this claim, the trial court found that any alleged deficiency in this regard was not serious enough to deprive Rutherford of a fair trial.
We agree with the trial court. Even though it appears that trial counsel's failure to object in the present case was not a matter of trial tactics and that trial counsel should have interposed an objection to the hearsay testimony at issue, this failure to object alone does not amount to the deficiency *221 contemplated in Strickland, under the circumstances of this case.
In addition, this testimony was heard in the penalty phase of the trial. In the penalty phase of a capital trial, any evidence "which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements." § 921.141(1), Fla. Stat. (1985). Given the wide latitude permitted in admitting penalty-phase evidence, even if trial counsel had objected, the hearsay testimony at issue may have been admissible as marginally relevant to rebut Rutherford's testimony in the guilt phase that the victim was like a mother to him, that he had no reason to give her a rough time, and that he was raised to have respect for the elderly. But cf. Dragovich v. State, 492 So.2d 350, 355 (Fla.1986) (hearsay reputation evidence that the defendant was an arsonist known as "The Torch" was inadmissible under section 921.141(1) because the testimony was "not susceptible to the fair rebuttal contemplated by the statute").
More importantly, even assuming that the hearsay testimony was inadmissible, and even assuming attorney deficiency in failing to object, we agree with the trial court that there was no resulting prejudice. As set forth by the United States Supreme Court:
[We] need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
Strickland, 466 U.S. at 697, 104 S.Ct. 2052. Even if the trial court improperly cited the victim's hearsay statements as one basis for finding CCP, the testimony at issue comprised only one of the several factors ultimately relied upon by the trial court in finding CCP:
[CCP] was proven by the witnesses whom the defendant told of his plan to kill the victim to get her money. The defendant discussed this crime with two or more people and stated to one of them that he would do the crime, but would not do the time. This was further established by the testimony at the penalty phase of the trial that indicated the victim was deathly afraid of the defendant and had expressed her fear of the defendant and her fear of being alone with him.
As we explained in upholding CCP on direct appeal, without reference to the subject hearsay testimony:
Rutherford apparently planned for weeks in advance to force [the victim] to write him a large check and then kill her in a manner that would look like an accidental drowning. Except for being able to force her to write the check, he followed his plan to the letter.
... Clearly, Rutherford's actions were "calculated," as we have defined the term.
Rutherford, 545 So.2d at 856.
This testimony was not admitted at the guilt phase nor was it made a feature of the penalty phase. Considering the totality of the evidence in support of the CCP, HAC and pecuniary gain aggravators, we find no reasonable probability that, even with the exclusion of this hearsay testimony, the jury's recommendation of death, or the trial court's decision to impose the death penalty, would have been different. See Strickland, 466 U.S. at 695, 104 S.Ct. 2052.

B. Failure To Present Adequate Mitigation
Rutherford's remaining issues on appeal relate to trial counsel's alleged failure to present adequate mitigation evidence. In determining ineffectiveness in this regard, and whether the penalty phase proceedings were reliable, "[t]he failure to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Rose, 675 So.2d at 571; see also Hildwin, 654 So.2d at 109-10. Rutherford here claims ineffectiveness as a result of trial counsel's failure to procure and present expert mental health testimony and trial counsel's failure to investigate, develop and present substantial mitigating evidence regarding *222 Rutherford's harsh childhood and Vietnam war experience.

1. Failure To Present Mental Health Testimony

At the 3.850 hearing, Rutherford presented the opinion testimony of two psychologists regarding Rutherford's mental health during the time frame in which the crime occurred. They opined that Rutherford suffered from post-traumatic stress disorder (PTSD) and was alcohol dependent. It is uncontroverted that at Rutherford's retrial no mental health expert testimony was offered, and Rutherford made no "claim of posttraumatic stress disorder." Rutherford, 545 So.2d at 856 n. 3.
However, at Rutherford's first trial, competency evaluations were prepared by two separate mental health professionals, both of whom found Rutherford competent to stand trial.[3] The competency evaluations indicated that Rutherford had a "fairly well documented history of alcoholism" and displayed "symptoms which are indicative of an anxiety disorder resulting from his combat experiences in Vietnam." Dr. James Larson, one of Rutherford's experts at the 3.850 hearing, acknowledged that the use of the phrase "anxiety disorder associated with Vietnam" is "a slightly different phrase" than PTSD, but that the evaluations were not "inconsistent" with his opinion; "the focus is simply different." Thus, there is no indication that the two available competency evaluations ignored any "`clear indications' of mental health problems." See Rose v. State, 617 So.2d 291, 295 (Fla.1993) (quoting State v. Sireci, 502 So.2d 1221, 1224 (Fla.1987)).
At Rutherford's retrial, trial counsel presented these competency evaluations to the trial court judge, but not to the jury. Instead, the jury heard only the lay testimony previously discussed from a friend, family members, and Rutherford himself regarding his positive character traits, his meager upbringing, and the consequences of his involvement in Vietnam.
At the 3.850 hearing, trial counsel testified that there was no indication from his discussions with Rutherford or his family, friends, and co-workers that Rutherford suffered any significant mental impairment. As to the competency evaluations, trial counsel testified that he intentionally did not introduce them in evidence before the jury. The evaluations reflected that Rutherford had episodes of violence (he had previously assaulted his father and his brother, and broken his hand when he hit a wall) and had spent time in jail and on probation for an assault and battery charge. Trial counsel testified that it was his strategic decision to present the competency evaluations to the trial court judge, but not to the jury, as mitigating evidence of Rutherford's mental health.
Trial counsel also testified that he was aware of similar counseling and Veteran's Administration records reflecting Rutherford's alcoholism and PTSD, but that the mitigation strategy focused on the "humanization" of Rutherford:
The theory on mitigation was to make [Rutherford] look as human as possible. Knowing the jury has convicted him and he is now a convicted person try to humanize him ... as a good fellow, good father, a good citizen, loyal Marine, ... loyal church member. Loyal and trustworthy, friendly.... [T]he strategy was the humanization and the goodness ... of A.D. Rutherford.
The trial court found that "[t]his strategy was reasonable under the circumstances" of this case, and that trial counsel was not deficient for failing to pursue mental mitigation. As found by the trial court:
Counsel made the decision to focus on the solid, "Boy Scout" character traits of Mr. Rutherford. The theory was that Mr. Rutherford was a "good ol' fellow" who must have just lost it. That he was really a good guy. The attempt was to make him *223 look as human as possible, to focus on his positive traits.
As for the information contained in the competency reports, the trial court also found that trial counsel
determined the contents of these reports would be detrimental, especially in view of the strategy dictated by Mr. Rutherford's insistence of innocence. But, to assure the ultimate sentencer had the benefit of these evaluations, counsel did submit them (despite the apparent objection of Mr. Rutherford) to the trial judge for his consideration.
Based on the record in this case, we find no error in the trial court's finding that trial counsel was aware of possible mental mitigation, but made a strategic decision under the circumstances of this case to instead focus on the "humanization" of Rutherford through lay testimony. "Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987); see also Bryan v. Dugger, 641 So.2d 61, 64 (Fla. 1994) (affirming denial of 3.850 relief where mitigation strategy was to "humanize" the defendant and trial counsel made a tactical decision not to call mental health expert; noting that "[t]his is not a case which defense counsel failed to prepare").
The fact that trial counsel here was aware of, but rejected, possible mental mitigation in favor of a "humanization" strategy distinguishes cases such as Rose where this Court remanded for a new resentencing proceeding because it was apparent from the record that "counsel never attempted to meaningfully investigate mitigation." 675 So.2d at 572. The evidence that would have been available in Rose if counsel had conducted a reasonable investigation included the defendant's abuse as a child, an IQ of 84, previous head trauma, chronic alcoholism and a previous diagnosis of a psychiatric disorder. See id. at 571. We found under the facts of that case that trial counsel's mitigation decisions were "neither informed nor strategic," and that "there was no investigation of options or meaningful choice." Id. at 572-73. Likewise, in Heiney v. State, 620 So.2d 171, 173 (Fla.1993), this Court rejected the State's argument that trial counsel's decision not to present any mitigation was "strategic," holding that counsel "did not make decisions regarding mitigation for tactical reasons. [Counsel] did not even know that mitigating evidence existed." See also Hildwin, 654 So.2d at 109 (remanding for new sentencing proceeding where "[t]rial counsel's sentencing investigation was woefully inadequate," as evidenced by the fact that he "was not even aware of [the defendant's] psychiatric hospitalizations and suicide attempts"); Phillips v. State, 608 So.2d 778, 782-83 (Fla.1992) (remanding for new sentencing proceeding where trial counsel did "virtually no preparation for the penalty phase").
In evaluating the Strickland prongs of deficiency and prejudice, it is important to focus on the nature of the mental mitigation Rutherford now claims should have been presented. This focus is of assistance when determining whether trial counsel's choice was a reasonable and informed strategic decision, as well as whether the failure to present such testimony (assuming that the failure amounted to a deficiency in performance) deprived the defendant of a reliable penalty phase proceeding.
For example, in Middleton v. State, 465 So.2d 1218, 1224 (Fla.1985), we affirmed the denial of 3.850 relief where the urged mitigating factors involving a psychiatric report and the defendant's childhood were "relatively minimal" compared to the aggravators at issue: prior violent felony, under sentence of imprisonment, pecuniary gain, and CCP. In contrast, in Rose, 675 So.2d at 571, in addition to failing to present evidence that the defendant was a slow learner with an IQ of 84, the psychological testimony at the 3.850 hearing included the fact that Rose suffered from organic brain damage and his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired at the time of the offense. See also Phillips, 608 So.2d at 782-83 (new sentencing hearing where strong mental mitigation included lifelong deficits in adaptive functioning, a schizoid personality, borderline intelligence range with an IQ between 73 and 75, and an inability to form the *224 requisite intent for CCP and HAC); accord Mason v. State, 489 So.2d 734, 736 (Fla. 1986)(new competency hearing ordered where significant evidence of an extensive history of mental retardation, drug abuse and psychotic behavior were not uncovered by defense counsel).
In this case, Dr. James Larson, a psychologist, testified that, in the time frame in which the crime occurred, Rutherford was suffering from PTSD, was alcohol dependent, and was under a lot of "stressors" in his marital and family life. Dr. Larson testified that, at the time of the offense, Rutherford was "likely under [an] extreme emotional disturbance," but based his conclusion upon the fact that Rutherford had an alcohol problem and problems with his wife. Dr. Robert Baker, also a psychologist, similarly testified that Rutherford "had post traumatic disorder, chronic, and severe." However, Dr. Baker's testimony was even less specific than Dr. Larson's, and he never explicitly connected Rutherford's emotional state to the murder.
The trial court discounted this testimony as the result of a defendant who was now "compliant" and of psychological examinations occurring years after the 1985 murder at issue.[4] The trial court further found that "neither expert connected Mr. Rutherford's personality disorder with the crime itself," and that
[t]he facts of the case do not establish that when the crime occurred Mr. Rutherford was intoxicated or was having an episodic event or other debilitating symptom of his PTSD. There is no evidence Mr. Rutherford's disorder contributed to his actions in effecting the murder.
The trial court concluded that "[n]o statutory mitigators were proven through the testimony of Dr. Larson and Dr. Baker." As further found by the trial court in this case:
Mr. Rutherford has a personality disorder associated with anxiety. His PTSD is classified as severe, not chronic. There is no indication he has a mental illness, is mentally retarded, or has any organic brain damage. There is no thought disorder or grossly disturbed thinking. In other words, his PTSD is not so severe that it involves serious secondary symptoms such as neurosis or psychosis.
The trial court acknowledged that
[d]espite not reaching the level of statutory mitigation, the collateral proceeding evidence made it clear that Mr. Rutherford's personality disorder and purported alcoholism were available non-statutory mitigators. But so did the pre-trial evidence in the hands of trial counsel. Though not as extensively, both trial counsel were aware of these same non-statutory mental health mitigators through the information in the two competency/sanity evaluations as supplemented by the other witnesses and the evidence.
The additional evidence of mitigation brought forward in the 3.850 does not approach the level of mitigation found in cases such as Rose, Middleton, and Phillips. We find no error in the trial court's assessment of the mental mitigation evidence presented at the 3.850 hearing or its assessment of trial counsel's trial strategy.

2. Failure to Investigate other Mitigation

Rutherford further argues as a basis for ineffective assistance of counsel that his trial counsel was deficient for failing to investigate, develop, and present substantial available mitigating evidence regarding his harsh childhood and Vietnam war experience. At trial, the "mitigating evidence consisted of testimony from Rutherford's friends and family members about his background and his nonviolent nature and from Rutherford himself about his experiences as a Marine infantryman in Vietnam." Rutherford, 545 So.2d at 856 n. 3. At the 3.850 hearing, Rutherford presented additional lay testimony that he increased his consumption of alcohol and had headaches upon returning from Vietnam; that his father had a drinking problem and was physically abusive; and that Rutherford had a troubled relationship with his wife. In many other respects, the 3.850 testimony was essentially cumulative to *225 the lay character testimony presented by trial counsel in the original penalty phase. See Woods v. State, 531 So.2d 79, 82 (Fla. 1988) ("[T]he testimony now advanced, while possibly more detailed than that presented at sentencing, is, essentially, just cumulative to the prior testimony. More is not necessarily better.")
As to the drinking problem and troubled relationship with his wife, these aspects were contained in the competency evaluations and were known to trial counsel. Trial counsel elected not to present this negative evidence in favor of depicting Rutherford as a decent family man. As to his claim that counsel should have elicited more testimony about his "harsh, abusive, and impoverished childhood," the trial court found:
The evidence presented at the hearing was not conclusive of an abusive situation. In fact, except for the testimony of his brother William, the other family members portrayed an essentially healthy family life quite distinct from the seriously dysfunctional family portrayed in the motion. Times were hard, and his father had a problem with alcohol, but, given the time and circumstances of Mr. Rutherford's childhood and conflicting stories from within his own family, it is difficult to say that his childhood was in fact abusive.
Additionally, evoking images of an abusive childhood and debilitating war experience would have been inconsistent with the reasonable penalty phase strategy [to humanize Rutherford] developed by counsel.
In further denying relief on this claim, the trial court found no deficiency because "any failure to present additional mitigating testimony [in this regard was] more the responsibility of Mr. Rutherford than his counsel. He refused to help his counsel develop mitigation... [and] insisted on pursuing the defense of innocence." Moreover, he not only refused to cooperate, but actually encouraged his parents not to speak with defense investigators. The trial court concluded that "[g]iven the limitations created by Mr. Rutherford's refusal to assist in a viable defense, counsel made reasonable tactical decisions with respect to the presentation of mitigating evidence about Mr. Rutherford's entire background inclusive of his childhood and war record." We find additional support for counsel's testimony about his difficulties with Rutherford, based on the fact that Rutherford was "placed in restraints before closing arguments in the penalty phase because of his threatening conduct." Rutherford, 545 So.2d at 857 n. 4.
We find no error in the trial court's determination that Rutherford's lack of cooperation was a hindrance to presenting additional mitigation evidence regarding his military background. Trial counsel testified to himself having a military background and being otherwise familiar with how to effectively use military decorations in mitigation, but that "Rutherford did not want me to use any military background or record, and would not discuss Vietnam service or his Marine Corps service in general" until he unexpectedly did so on the stand during the penalty phase. Trial counsel similarly testified that Rutherford discouraged his parents from talking to or cooperating with trial counsel. As found by the trial court, Rutherford's uncooperativeness at trial belies his present claim that his trial counsel was deficient for not investigating and presenting mitigation regarding his harsh childhood and military history.
Furthermore, neither his harsh childhood nor his military history are statutory mitigators, although both are potential nonstatutory mitigators. As we held in Rutherford's direct appeal, "[t]he evidence that Rutherford had served in the armed forces in Vietnam may be considered by a trial judge as a mitigating factor, but need not be." Rutherford, 545 So.2d at 856. Compare Masterson v. State, 516 So.2d 256, 258 (Fla.1987) (evidence that defendant was wounded, honorably discharged from Vietnam, introduced to drugs in Vietnam, suffered post-traumatic stress disorder, and consumed substantial amounts of drugs and alcohol on day of the murder, together with other matters presented in penalty phase, was sufficient to establish a reasonable basis for the jury to find mitigating circumstances sufficient to recommend life).

3. Lack of Prejudice

Even if the additional mitigation evidence Rutherford presented at the 3.850 *226 hearing had been heard and considered by the jury and original judge, it is not reasonably probable, given the nature of the mitigation offered, that this altered picture would have led to the imposition of a life sentence, outweighing the multiple substantial aggravators at issue in this case (HAC, CCP, and robbery/ pecuniary gain). Rutherford was not deprived of a reliable penalty proceeding. See Rose, 675 So.2d at 571.
In Haliburton v. Singletary, 691 So.2d 466, 471 (Fla.1997), we held that "[i]n light of the substantial, compelling aggravation found by the trial court [i.e., under sentence of imprisonment, prior violent felonies, committed during a burglary, and CCP[5]], there is no reasonable probability that had the mental health expert testified, the outcome would have been different." Similarly, as we held in Lusk v. State, 498 So.2d 902, 906 (Fla. 1986):
The evidence now claimed by appellant that should have been admitted in mitigation is largely evidence of appellant's troubled family background. Appellant testified about his background and personal problems during the penalty phase. We must agree with the trial court below in its order denying relief, that this "new evidence" is largely cumulative and would not have affected the ultimate sentence imposed in view of the aggravating factors [i.e., HAC, under sentence of imprisonment, and previous felony conviction[6]] affirmed by this Court in appellant's direct appeal.
See also Breedlove v. State, 692 So.2d 874, 878 (Fla.1997) (affirming denial of 3.850 relief where "the three aggravating factors we have previously affirmed [prior violent felony, during course of burglary, and HAC[7]] overwhelm whatever mitigation the [3.850] testimony of [the defendant's] friends and family members could provide").

VI. CONCLUSION
Considering both the failure to object and the failure to present the mitigation evidence presented at the 3.850 proceeding, we agree with the trial court that counsel's performance considered as a whole was not deficient. Rutherford has failed to demonstrate either prong of an ineffective assistance of counsel claim. Cast in Strickland terms, Rutherford has failed to show that his trial counsel's alleged errors were so serious as to deprive him of "a fair trial, a trial whose result is reliable," 466 U.S. at 687, 104 S.Ct. 2052, and our confidence in the outcome is not undermined. See id. at 694, 104 S.Ct. 2052; see also Rose, 675 So.2d at 574. Accordingly, we affirm the trial court's denial of 3.850 relief.
Last, but not least, we wish to commend the trial court's diligence in conducting an extensive evidentiary hearing and thereafter providing a thorough and well-analyzed order. This conscientious attention by the trial court greatly assists this Court in determining whether the appellant's claims have legal merit, and whether the asserted flaws undermine our confidence in this capital proceeding.
It is so ordered.
HARDING, C.J., and OVERTON, SHAW, KOGAN, WELLS, ANSTEAD and PARIENTE, JJ., concur.
NOTES
[1] Specifically, Rutherford raised the following 15 claims in his 3.850 motion below: (1) ineffective assistance of counsel ("IAC") at the guilt phase for failing to investigate, prepare, and perform sufficiently; (2) IAC at the penalty phase for failing to investigate, develop, and present substantial mitigation; (3) IAC at the penalty phase for failing to object to hearsay testimony regarding the victim's fear of Rutherford; (4) improper penalty-phase jury instructions that shifted the burden of proof to Rutherford; (5) improper penalty-phase jury instructions regarding aggravating circumstances; (6) inapplicability of CCP; (7) improper penalty-phase jury instruction on HAC; (8) untimely imposition of written death sentence; (9) trial court's refusal to find mitigators established by the record; (10) IAC at penalty phase for conflict of interest in revealing confidences and secrets to the trial court; (11) admission of inflammatory photographs; (12) improper introduction of nonstatutory aggravators at the penalty phase; (13) IAC at the penalty phase for failing to obtain mental-health expert; (14) improper robbery sentence without benefit of scoresheet; and (15) double jeopardy bar to retrial.
[2] Specifically, as to issue four, Rutherford unsuccessfully raised his double jeopardy claim on direct appeal. See Rutherford v. State, 545 So.2d 853, 855 (Fla.1989). As we held in Medina v. State, 573 So.2d 293, 295 (Fla.1990), "[p]roceedings under rule 3.850 are not to be used as a second appeal."

As to issue six, Rutherford challenges the trial court's summary denial of his 3.850 claims that the trial court improperly relied on non-statutory aggravators (i.e., lack of remorse) and gave no written reason for its departure sentence on Rutherford's robbery conviction. Rutherford unsuccessfully raised both of these issues on direct appeal, see Rutherford, 545 So.2d at 855-57, rendering these claims procedurally barred here. See Medina, 573 So.2d at 295. Also under issue six, Rutherford challenges the trial court's summary denial of his 3.850 claims that the jury was not properly instructed on aggravating factors and that the trial court did not impose a written sentence of death until eight days after sentencing. Rutherford could have raised these issues on direct appeal, rendering them procedurally barred here. See, e.g., Robinson v. State, 707 So.2d 688, 690 n. 2, 690 (Fla.1998) (summarily disposing of 3.850 claims as procedurally barred that "should have been raised" on direct appeal, "even if couched in ineffective assistance language") (citing Clark v. State, 690 So.2d 1280, 1282 n. 3 (Fla.1997); Chandler v. Dugger, 634 So.2d 1066, 1069 (Fla.1994)).
[3] Read together, these competency evaluations indicate that, at the time of the offense, Rutherford was "sane" or not in any "disturbed mental condition," and did not have "any severe impairment of the cognitive processes involved in judgment or reasoning" or suffer from "any mental infirmity or defect or disease resulting in any loss of ability to understand or reason accurately." We of course recognize that competency evaluations are different from mitigation evaluations, and in no way mean to imply here that one can necessarily take the place of the other.
[4] Specifically, Dr. Larson did not evaluate Rutherford until 1991, six years after the 1985 murder at issue here; Dr. Baker did not evaluate Rutherford until 1996, more than ten years after the subject murder.
[5] See Haliburton v. State, 561 So.2d 248, 249 n. 1 (Fla.1990) (discussing applicable aggravators on direct appeal).
[6] See Lusk v. State, 446 So.2d 1038, 1042-43 (Fla.1984) (discussing applicable aggravators on direct appeal).
[7] See Breedlove v. State, 413 So.2d 1, 9 (Fla.1982) (discussing applicable aggravators on direct appeal).