825 So.2d 293 (2002)
Danny Harold ROLLING, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-625.
Supreme Court of Florida.
June 27, 2002.
Rehearing Denied August 23, 2002.
*294 Baya Harrison, III, Monticello, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Carolyn M. Snurkowski, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Danny Harold Rolling, a prisoner under sentence of death, appeals the trial court's denial of his motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the trial court's order denying Rolling postconviction relief.

BACKGROUND
Rolling was charged with five counts of first-degree murder, three counts of sexual battery, and three counts of armed burglary of a dwelling with a battery, which occurred in Gainesville during August of 1990. This Court previously summarized the facts surrounding these crimes on direct appeal. See Rolling v. State, 695 So.2d 278, 281-82 (Fla.1997).
On June 9, 1992, Rolling entered a plea of not guilty on all counts. Subsequently, on February 15, 1994, the day set for trial, *295 Rolling changed his plea to guilty on all counts. The trial court accepted Rolling's plea after reviewing with him the factual basis for it and adjudicated him guilty on all counts. A penalty phase proceeding was held, and the jury recommended that Rolling be sentenced to death for each murder by a vote of twelve to zero. The trial court followed the jury's recommendation and sentenced Rolling to death for each homicide. We affirmed Rolling's sentences on direct appeal. See id. at 297. The United States Supreme Court denied Rolling's petition for writ of certiorari on November 17, 1997. See Rolling v. Florida, 522 U.S. 984, 118 S.Ct. 448, 139 L.Ed.2d 383 (1997).
Rolling filed his original 3.850 motion in November of 1998. In April of 1999, Rolling filed an amended 3.850 motion asserting two claims.[1] Following a Huff[2] hearing, the trial court held an evidentiary hearing on July 11-12 and July 15, 2000. Thereafter, the trial court entered a comprehensive, thirty-eight page order denying relief. This appeal follows.

ANALYSIS
On appeal, Rolling argues that the trial court erred in denying his claim alleging trial counsel were ineffective for failing to timely seek and procure a change of venue.[3] Rolling's argument that trial counsel were ineffective is essentially twofold. First, Rolling argues that trial counsel were ineffective for waiting until jury selection was underway to move for a change of venue, rather than seeking a venue change during the three years preceding trial. Second, Rolling argues that even after they belatedly filed a motion for change of venue, trial counsel failed to adequately support the motion and argue in favor of a venue change. Rolling contends that had trial counsel timely sought and sufficiently supported the motion, the trial court would have been required to grant a change of venue.
On direct appeal, this Court thoroughly addressed the issue of whether the trial court erred in denying Rolling's motion for change of venue, which was ultimately filed by trial counsel.[4]See Rolling, 695 So.2d at 283-88. In finding that the trial court did not err in denying Rolling's motion for change of venue, we emphasized the meticulous jury selection procedure and screening process undertaken by the trial court. Moreover, we expressly rejected Rolling's argument that the pretrial publicity presumptively prejudiced the entire Alachua *296 County community against him, as well as his claim of actual prejudice. See id. at 285-88. In sum, we concluded:
[B]ecause we find that the trial court's system was an effective one which produced an impartial jury, we affirm the trial court's denial of Rolling's motion for a change of venue. Neither the pretrial publicity in this case nor the lengthy jury selection process evidenced a community bias so pervasive as to make it impossible, under any circumstances, to seat an impartial jury in Gainesville.
Id. at 288.
This Court has repeatedly recognized that claims which were raised on direct appeal are procedurally barred in postconviction proceedings. See, e.g., Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla. 1995). At the same time, we have also recognized that a claim of trial court error and a claim of ineffectiveness may arise from the same underlying facts, but the claims themselves are distinct andof necessity have different remedies. See Bruno v. State, 807 So.2d 55, 63 (Fla.2001). Notwithstanding this distinction, based on the record in this case and our previous opinion thoroughly treating the venue issue and concluding that it was without merit, we find Rolling's claim is procedurally barred.
However, even if Rolling's claim were not barred, we would find it to be without merit.[5] In order to prove an ineffective assistance of counsel claim, a defendant must establish two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216, 219-20 (Fla.1998); Rose v. State, 675 So.2d 567, 569 (Fla.1996). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the Strickland test. See Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.
In denying relief, the trial court determined that Rolling had failed to satisfy *297 either prong under Strickland. After thoroughly discussing the case history and postconviction proceedings, the trial court concluded as follows:
While the defense team's belief in the ability to choose their model jury in Gainesville may have changed because of their evaluation of the jurors during voir dire, it was certainly not an unreasonable one. The record is replete with evidence that these attorneys did everything in their power to ensure that the adversarial process functioned as it should in our system of justice. One need only peruse the index of pleadings to see the Herculean efforts of the defense attorneys to protect their client's best interests. The index shows four pleadings relating to the grand jury; ten pleadings concerning protective orders; eight pleadings regarding public disclosure of materials and/or in camera inspections; eight pleadings relating to suppression of evidence; four pleadings regarding voir dire (including the motion for change of venue); five jury-related documents; and at least twenty-nine other motions. All told, the defense team filed in excess of seventy pleadings on Rolling's behalf. While the Court is mindful that quantity does not necessarily reflect quality, this case is a textbook example of strategic thinking and careful planning by skilled defense attorneys whose reputations amongst other members of the Florida bar, such as Dave Davis, bespeak their effectiveness.
A glance through the motions for protective orders and motions to prohibit public disclosure is ample reminder that for three years, the defense team took every opportunity possible to bring to this Court's attention the considerable publicity surrounding this case. It is difficult to fathom what else counsel could have done to make this jurist any more acutely aware of the circumstances of this case prior to jury selection. There is nothing counsel could have done in the voir dire process itself that would have increased this Court's scrutiny of each venireman, heightened the Court's observations, or increased the Court's attention to the reasonable doubt standard to which each juror was held.
A survey such as suggested by Defendant would not have changed the responses of the potential jurors. The defense team members testified that although technically giving all the right answers during voir dire, they concluded that the potential jurors were affected at a deeper level than perhaps even the jurors themselves knew. The only way the team was able to arrive at such a conclusion was to stand eye-to-eye with them, observing facial expressions and hearing vocal inflections. None of this information would have emerged from a pen-and-pencil questionnaire, and the lawyers were not ineffective for failing to conduct such an exercise.
In the final analysis, the difficulty with the defense team's case lay not in combating the extensive media coverage, but in the detailed confessions that came from the hand and mouth of their own client and the stark reality of the acts visited upon his victims. The jury selected received an abbreviated and condensed exposure to the horrific facts of this case. The evidentiary portion of the proceedings took two weeks, not the many months contemplated for a complete guilt phase trial. Any challenge to the integrity of the proceedings that occurred must be measured against the gravity of the offenses and the total absence of innocence, or even the thought of innocence, of Rolling in the minds of the advisory jury. That would *298 occur no matter where this case was tried.
In essence, the challenge here is based upon the belief of the defense's jury expert, Rolling's trial lawyers, and now his post-conviction counsel that the jury was prejudiced, and that this prejudice was unbeknownst even to the jury members themselves. This trial judge did not find that to be the case from listening to and watching these jurors. Nothing in the evidence presented at the hearing on the motion has moved the Court to find any lack of effort or thought on behalf of Defendant's trial team. In essence, the plea is to grant relief because the defense attorneys did not foresee the jury prejudice they soon enough perceived and because when they did, the trial team could not convince the Court of the reality of a prejudiced jury. The reality being overlooked in this argument is the entire history of the voir dire and the events underlying it. Perhaps the jury simply believed, after a full consideration, that the aggravating circumstances were not outweighed by the mitigators presented on Rolling's behalf.
For the reasons expressed below, we agree with the trial court's denial of postconviction relief on this claim.

CHANGE OF VENUE
The decision of whether to seek a change of venue is usually considered a matter of trial strategy by counsel, and therefore not generally an issue to be second-guessed on collateral review. See, e.g., Buford v. State, 492 So.2d 355, 359 (Fla.1986) ("Counsel's failure to move for a change of venue was a tactical decision and therefore not subject to attack."). Further, this Court has reiterated that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000). The fact that Rolling's collateral counsel might have moved for a change of venue earlier in the proceedings does not necessarily place trial counsel's decision to forego that option outside the wide range of reasonably effective assistance. See Occhicone, 768 So.2d at 1048 ("Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions."); Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995) ("The standard is not how present counsel would have proceeded, in hindsight...."). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
As noted above, Rolling argues that trial counsel were ineffective for failing to move for a change of venue earlier in the proceedings. At the postconviction evidentiary hearing, however, Rolling's trial counsel testified that they made an informed tactical decision to initially attempt to have the case tried in Alachua County, notwithstanding the pretrial publicity surrounding the case.[6] For instance, defense attorney Richard Parker testified that in the years preceding Rolling's trial he believed it was in Rolling's *299 best interest to be tried in Alachua County. Based on years of experience and discussions with attorneys from throughout Florida as a member of the Death Penalty Steering Committee, Parker explained that Alachua County's venire is generally viewed as being "more open-minded, more understanding, and more willing to consider life recommendations as opposed to death sentences." Parker further explained that the defense's strategy was to seat jurors who were especially willing to consider mental health mitigation. Parker reiterated that the defense team had several long discussions concerning venue, including the possibility of moving for a change of venue should it become necessary.
Attorneys Barbara Blount Powell and John Kearns also testified that the initial decision to attempt to try the case in Alachua County was a strategic decision based on their experience with juries in that county and the county's general reputation among attorneys. In particular, Blount Powell testified that the initial venue decision was primarily based on the defense team's belief that they needed an intelligent and open-minded jury that would consider mitigating circumstances. Although the defense was concerned with publicity, she noted that historically they had experienced good juries in Alachua County, which were intelligent and open-minded, and the defense team felt that an Alachua County jury would be most receptive to psychological testimony.
John Kearns similarly testified that based on his experience with the Death Penalty Steering Committee, there is a general reputation among both defense attorneys and prosecutors that Alachua County is a favorable venue for defense cases, including capital cases. When asked why the defense did not seek to change the venue from Alachua County prior to trial, Kearns explained:
It appeared that this was going to be a sentencing phase proceeding, and thatthis was even before Mr. Rolling had entered his plea. And I was telling about balancing, that there was an extraordinary amount of publicity in the community concerning Mr. Rolling, but at the same time, from my own experience in handling capital cases in Alachua County, the general reputation Alachua County shares as being a favorable venue for these types of issues, the fact that the Gainesville Sun, the largest newspaper in this community, is very actively against the death penalty and devotes quite a bit of editorial space to that topic, and the fact that we know from experience, in looking at the results of death penalty litigation, at least from the northern part of the state where we can make comparisons, that this is a favorable venue to try and do capital litigationonce again, the make up of the community, because of the education and because of the high medical community itself of Gainesville, and considering the issues I was going to have to be arguing in mitigation, I had to weigh these factors.
I felt that, without knowing where we would go, and having no control over where we would goas I've explained the only time the defense gets to elect, we have no control or say where we go other than that one situationthat the question becomes: where do you go, can it be worse? I came to the conclusion, yes, it could be worse. So I thought we wouldand at that time I felt we were probably as good as any place else being in Gainesville, Florida. And that was my conclusion, at least up until the beginning of trial. *300 Both Kearns and Blount Powell reiterated that the defense team weighed at length the pros and cons of venue remaining in Alachua County, before consensus on Alachua County was reached.
Further, Dr. Raymond Buchanan, who assisted the defense team at trial with media analysis and jury selection, acknowledged at the evidentiary hearing that he believed trial counsel's initial decision concerning venue was reasonable. Dr. Buchanan testified that one of the first things to consider in a high profile case is venue and that he originally thought venue should be changed in this case. Despite his initial view toward venue, Dr. Buchanan subsequently agreed with trial counsel's decision that Alachua County was the best place for Rolling's trial. In a memorandum to Richard Parker dated May 3, 1993, Dr. Buchanan opined:
Normally, with this kind of media coverage, the defense would probably move for a change of venue. However, I strongly agree with your analysis. In spite of the media coverage, Gainesville is an excellent place for this trial. The traditional liberal trends in this county, along with the level of education, justifies this position. I can't think of a better place in all of Florida to hear this particular case.[7]
As voir dire unfolded, however, Dr. Buchanan testified that his view toward venue once again changed.[8] Consequently, Dr. Buchanan advised the defense team that he believed a change of venue should be sought.
Despite coming "full circle" on the issue of venue, however, Dr. Buchanan testified at the postconviction evidentiary hearing that he believed there was an honest assumption on trial counsel's part that they could find open-minded people in Alachua County to whom they could make their case. Dr. Buchanan further testified:
I think that they laid out the evidence, their intuitive, qualitative feelings about this, and Iyou know, I found it to be sensible and reasonable, and at the time that I heard these things, it did sound reasonable. And, you know, when I put myself back in that time frame, knowing what we knew then, it was reasonable. *301 There was nothing unreasonable about it.

(Emphasis supplied.) This assessment was later reflected in the trial court's decision denying postconviction relief.
As demonstrated above, trial counsel's decision not to seek a change of venue earlier in the proceedings was a strategic decision based on their initial belief that trying the case in Alachua County provided the best opportunity of seating an intelligent and open-minded jury that would consider mitigating circumstances. Trial counsel's decision was informed by years of experience with Alachua County juries in capital and noncapital cases.[9]
Collateral counsel, in essence, first sought to have the trial court and now seeks to have this Court second-guess trial counsel's initial decision about whether Rolling had a better chance, however slim it may have been, with a jury in Alachua County than with a jury in another part of Florida. We decline to do so. See Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir.1998) (declining to second-guess counsel's "considered decision about whether Provenzano stood a better chance, however slim it may have been, with a jury in Orlando than with a jury in St. Augustine"). Although attorneys may differ as to venue strategy, we agree with the trial court's conclusion that the decision in this case has not been demonstrated to have fallen outside the wide range of reasonable professional assistance. See Weeks v. Jones, 26 F.3d 1030, 1044 n. 13 (11th Cir. 1994) (noting that counsel's strategic decision not to seek a change of venue based upon his experience in that county was the type of decision the Supreme Court cautioned courts about questioning); see also Cox v. Norris, 133 F.3d 565, 573 (8th Cir. 1997) (holding that counsel's tactical decision not to seek a venue change was reasonable because he believed other counties were prone to harsher sentences); Huls v. Lockhart, 958 F.2d 212, 214-15 (8th Cir. 1992) (concluding that trial counsel were not ineffective for failing to seek a change of venue where counsel considered among other things their familiarity with the county where case was to be tried).

SUPPORT FOR CHANGE OF VENUE
Within this issue, Rolling also alleges that trial counsel were ineffective for failing to adequately support the motion for change of venue once filed at trial. Rolling contends that had trial counsel adequately supported the motion with sufficient evidence documenting the adverse pretrial publicity and the severe psychological impact the murders had on the Gainesville community, the trial court would have granted the change of venue. The record, however, refutes Rolling's suggestion that trial counsel did not adequately support the motion for change of venue.
Prior to filing the motion for change of venue, trial counsel had repeatedly brought the issue of pretrial publicity to the trial court's attention. Indeed, the trial court stressed in its order denying postconviction relief that
A glance through the motions for protective orders and motions to prohibit public disclosure is ample reminder that for three years, the defense team took every opportunity possible to bring to this Court's attention the considerable publicity surrounding this case. It is difficult *302 to fathom what else counsel could have done to make this jurist any more acutely aware of the circumstances of this case prior to jury selection.
For example, trial counsel filed with their motion for individual, sequestered voir dire an exhibit consisting of over 400 newspaper articles regarding the murders published in The Gainesville Sun between August 29, 1990, and April 16, 1993.[10] In addition, trial counsel filed a supplement to the motion for change of venue consisting of numerous news articles published in The Gainesville Sun, The Independent Florida Alligator, and The Florida Times-Union during the months preceding Rolling's trial, as well as transcripts from news broadcasts which aired during this same time period.[11]
Rolling's additional suggestion that trial counsel were deficient for failing to conduct a community survey or study to determine the need for a venue change and to demonstrate to the trial court the impact the murders had on the Gainesville community was also rejected by the trial court. Although Dr. Buchanan acknowledged at the postconviction evidentiary hearing that a community survey might have been helpful as a "supplement," he testified that actual voir dire questioning was a far better data collection process, enabling the defense team to see "eyeball to eyeball" the potential jurors and hear the "emotional tone of the response."[12] Further, as noted by the trial court, defense counsel attempted on a number of occasions to use questionnaires to gauge the feelings and beliefs of the potential jurors. Although generally prohibited by the trial court in written form, these questionnaires formed the "backbone" of the defense team's voir dire questioning. Lastly, the trial court in this case undertook a meticulous jury selection process in order to seat an impartial jury and, having heard the responses of potential jury members, it is unlikely that the trial court would have given much weight to the type of community survey Rolling now contends was necessary.

PREJUDICE
Moreover, even assuming trial counsel were deficient for failing to timely seek and support the motion for change of venue, Rolling would not be entitled to relief unless he demonstrated prejudice from counsel's alleged errors. Generally, under Strickland, to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. In Wike v. State, 813 So.2d 12 (Fla.2002), this Court recently explained:

*303 When applying the prejudice prong to a claim that defense counsel was ineffective for failing to move for a change of venue, the defendant must, at a minimum, "bring forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if [defense] counsel had presented such a motion to the court."
Id. at 18 (quoting Meeks v. Moore, 216 F.3d 951, 961 (11th Cir.2000)). As noted previously, the trial court, when ultimately faced with the venue issue, was unquestionably well aware of the large amount of publicity surrounding this case from the early stages of the proceedings. Indeed, the trial court's orders on disclosure, its order denying Rolling's motion for change of venue, and the meticulous jury selection process employed by the trial court belie any suggestion that it was not mindful of the pretrial publicity. Further, Rolling failed to adduce, any evidence at the postconviction evidentiary hearing that would undermine a finding that the trial court was sufficiently cognizant of the pretrial publicity when ruling on the motion for change of venue.
Moreover, this Court on direct appeal thoroughly addressed Rolling's claim that the trial court erred in denying his motion for a change of venue. Based upon our independent evaluation of the circumstances, we rejected Rolling's claim that the pretrial publicity was so pervasive and prejudicial that it must be presumed as a matter of law that the venire, as well as the actual members of the jury, were biased against him. In so doing, this Court concluded, "Because we find the trial court's evaluation of the media coverage in this case to be consistent with our own review of the record, we reject Rolling's claim that the pretrial publicity presumptively prejudiced the entire Alachua County community against him." Rolling, 695 So.2d at 287. Additionally, we rejected Rolling's claim that the responses of actual jurors demonstrated a community-wide bias against him, finding it to be "completely contrary to the evidence in the record." Id. In sum, we concluded that "the intricate jury selection process employed in this case and the responses of actual jurors during questioning shows that it was possible to seat an impartial jury in Alachua County." Id. at 288. Significantly, this Court reiterated on direct appeal that "our affirmance of the trial court's order denying Rolling's motion [for change of venue] is based on a review of all the evidence of pretrial publicity contained in the record." Id. at 284 n. 4 (emphasis supplied).
Simply put, Rolling has not demonstrated any basis for this Court to re-evaluate its previous rejection of his claim alleging presumptive and actual prejudice on the part of jurors. In light of the amount of pretrial publicity presented at trial, appellate counsel's strenuous argument on direct appeal as to venue, and this Court's thorough examination of the issue, we find Rolling has failed to establish prejudice.

CONCLUSION
For the reasons stated above, we affirm the trial court's denial of postconviction relief.
It is so ordered.
WELLS, C.J., and SHAW, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
HARDING, J., concurs in result only.
NOTES
[1] These claims were: (1) trial counsel were ineffective for failing to timely seek and procure a change of venue; and (2) trial counsel were ineffective for failing to challenge particular jurors during voir dire. In his amended 3.850 motion, Rolling abandoned the additional twenty-nine claims which were raised in a summary fashion in his original motion.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] To the extent Rolling alleges on appeal that trial counsel were ineffective due to an actual conflict of interest, we find his claim to be without merit. Rolling's argument is premised on the public defender's previous representation of two of the State's penalty phase witnesses, Russell Binstead and Bobby Lewis, in unrelated matters in 1977 and 1979, respectively. We conclude Rolling has failed to demonstrate that an actual conflict of interest existed that adversely affected counsel's representation. See Hunter v. State, 817 So.2d 786, 791-92 (Fla.2002).
[4] On February 25, 1994, during the jury selection process, Rolling filed a motion for change of venue. Following a hearing on February 28, the trial court orally denied Rolling's motion. Rolling's trial counsel renewed the motion immediately prior to the court empaneling the jury, and again as part of Rolling's motion for a new sentencing hearing. On May 20, the trial court entered a ten-page order explaining its reason for denying Rolling's motion for change of venue.
[5] Although it also believed Rolling's claim was procedurally barred, the trial court chose to address the merits of the claim to avoid the potential delay of remand if this Court were to find a procedural bar inappropriate and to give every opportunity for any superior court to have a full and complete record upon which to render its ruling. In overlooking the procedural bar, however, the trial court strictly confined its inquiry to whether trial counsel were ineffective for failing to timely appreciate the need for a change of venue or present additional evidence to support the motion eventually filed.
[6] Rolling was represented at trial by four attorneys from the public defender's office. Three of Rolling's trial attorneys, Richard Parker, Public Defender for the Eighth Judicial Circuit, John Kearns, chief assistant public defender, and Barbara Blount Powell, an assistant public defender, testified at the post-Conviction evidentiary hearing.
[7] Dr. Buchanan's view was based in part upon his discussions with Rolling's trial counsel, as well as with other attorneys practicing criminal law in the Gainesville area.
[8] In a memorandum to Rolling's trial counsel dated February 22, 1994, Dr. Buchanan explained in part:

I have now sat through most of the jury selection process as it relates to death qualification. To say the least, from the standpoint of the defense, the situation is both bleak and desperate. The Gainesville jurors are as good as everyone said they were. I don't believe we could find a better panel anywhere in the state. These jurors are honest and good people. With a normal first degree murder case, these jurors would be excellent. From a general point of view, these jurors are not overly death prone and, in many cases, appear very open minded. I think that the right decision was made to try this case in Gainesville.
Here is the problem and why we are in such desperate circumstances. Many of the jurors that I have seen, while not death prone in most cases, appear to clearly be "death prone" in this case. They struggle to be open minded, but they are having a very difficult time. I think we all understand that. There is a lot of pressure on these jurors to collectively represent the anger of the public concerning this case. They never admit to such pressure but, I think in a way, we all feel it. Thus, this jury pool, in this particular case, is very death prone. The general public feels that death is appropriate in this case, and you can see the steady influence of that general feeling on nearly every juror.
Dr. Buchanan further explained the reasons for his change of view in a memorandum to Richard Parker dated February 25, 1994.
[9] In addition, trial counsel relied on a study conducted by Michael J. Herkov, Ph.D., a professor of psychiatry at the University of Florida. The "Herkov Report," as it was called, analyzed the effect that the murders had on the Gainesville community over a period of eighteen months, concluding that most of the emotional distress associated with the crimes abated over time.
[10] At the hearing on the motion for change of venue, the trial court took judicial notice of this earlier filing.
[11] The supplement filed on March 17, 1994, contained nine articles published in The Gainesville Sun between December 31, 1993, and February 25, 1994, fourteen articles published in The Independent Florida Alligator between January 1 and February 28, 1994, and eleven articles published in The Florida Times Union between January 1 and February 26, 1994. Trial counsel also filed transcripts of nineteen news broadcasts on WUFT-TV, Channel 5, which aired between January 1 and February 28, 1994, and twenty news broadcasts on WCJB-TV 20, which aired between January 6 and March 2, 1994.
[12] Dr. Buchanan eventually recommended that a survey be conducted in the case, but he did so only after he became concerned during voir dire. Moreover, at the evidentiary hearing, Dr. Buchanan acknowledged that due to the limitations of questionnaires, he was not sure the perceived hostility of potential jurors would have emerged in an earlier survey.