# Supreme Court of Florida

————————

No. SC2021-1778

————————

**LEON DAVIS, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

————————

No. SC2022-0882

————————

**LEON DAVIS, JR.,**
Petitioner,

vs.

**RICKY D. DIXON, etc.,**
Respondent.

February 1, 2024

PER CURIAM.

Leon Davis, Jr., a prisoner under sentences of death, appeals the circuit court's denial of his initial motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. He also

petitions this Court for a writ of habeas corpus. We have jurisdiction. *See* art. V, §§ 3(b)(1), (9), Fla. Const. For the reasons we explain below, we affirm the denial of postconviction relief and deny Davis's habeas petition.

The murders involved in this postconviction appeal and habeas proceeding occurred on December 13, 2007, at the Headley Insurance Agency in Polk County. Davis was sentenced to death following a jury trial, and his convictions and sentences were affirmed on direct appeal. *See Davis v. State*, 207 So. 3d 142 (Fla. 2016).

Davis is also the appellant in another 3.851 postconviction appeal, *Davis v. State*, SC2021-1779, and the habeas petitioner in *Davis v. Dixon*, SC2022-0883. The murders in these cases occurred at a BP gasoline station in Polk County several days prior to the Headley murders, and the opinion in these cases is also released today. Where it is necessary to distinguish between these matters, they will be referred to as "Headley" or "BP."

**FACTS AND PROCEDURAL BACKGROUND**

The extensive facts of this case, set forth in this Court's opinion on direct appeal, are as follows:

*The Events at Headley Insurance*

The evidence introduced at Davis's trial revealed the following. Around 3 p.m. on December 13, 2007, Davis entered the Lake Wales location of the Headley Insurance Agency (Headley) with the intent to commit robbery. Davis was armed with a loaded .357 magnum revolver and equipped with duct tape, a cigarette lighter, gloves, a gasoline can that contained gasoline, and a lunch cooler to conceal the revolver.

That afternoon, two Headley employees, Yvonne Bustamante (Bustamante) and Juanita Luciano (Luciano), were working. Bustamante, a licensed customer service representative, had worked at Headley for nine years. Luciano, a customer service representative, had worked at Headley for about three years. At the time, Luciano was twenty-four weeks pregnant. Upon entering the business, Davis locked the front door to prevent other customers from entering. He also placed duct tape over the lens of a security camera. Davis demanded money from the women, who initially refused to comply.

Davis then forced the women to open the company's safe and cash box, which contained a combined amount of about $900. During the course of the robbery, Davis bound the women with duct tape, poured gasoline on them, and set them on fire. At 3:35 p.m., one of the women activated the office's panic alarm, which sent a signal to the alarm company. The Lake Wales Police Department was contacted one minute later.

*Victims Seek Help; Davis Shoots Bystander*

Bustamante and Luciano escaped the burning building and ran in separate directions seeking help. Bustamante eventually ran to the parking lot of the Headley building, and Luciano ran to a nearby restaurant, Havana Nights. As Bustamante tried to escape, Davis shot her in her left hand.

By this time, concerned people who lived nearby had noticed the presence of smoke and walked to the

area to investigate. These people, Fran Murray, Brandon Greisman, and Carlos Ortiz, were on the scene before emergency personnel arrived and became eyewitnesses to the aftermath of the robbery. Another eyewitness, Evelyn Anderson, was a Headley customer who arrived at Headley while the robbery was in progress. At trial, these eyewitnesses testified about the events at Headley, including their various encounters with Davis.

Fran Murray (formerly Fran Branch) testified that at the time of the robbery, she was sitting outside of her apartment and saw smoke nearby. She walked toward the smoke to investigate its source. Around the same time, her neighbors, including Greisman and Ortiz, also noticed the smoke. They all proceeded to walk toward the smoke to investigate.

As Murray approached the smoke, she realized that it was coming from the Headley building. She then saw Bustamante, who was yelling for help and whose body was burning. Murray observed that Bustamante was wriggling her wrists to free them of a thick gray tape, and that Bustamante's "skin was falling off of her." "And, just, she wasn't screaming, but she wasn't talking lightly either. She was just trying to get away."

As Greisman approached the building, he saw a woman whose body was burning, and he went to help her. At the same time, Greisman saw Davis walking towards them, and he originally thought that Davis was coming to help the distressed woman. Greisman made eye contact with Davis, who pulled a gun out of the cooler that he was carrying and pointed it at Greisman. Greisman tried to get away, but Davis shot him in the face, hitting him in the nose. The gunshot caused profuse bleeding and removed the tip of Greisman's nose.

Murray, who was still in the vicinity, heard popping sounds and saw Greisman fall to the ground and catch himself with his hands. She saw Davis walk away and place a gun into his lunch cooler. Murray then assisted Greisman, who was getting up from the ground.

Carlos Ortiz also heard the popping sounds as he approached the Headley building. As he got closer to the building, Greisman was walking back toward him with a bloody face. Greisman told Ortiz that he had been shot, and Ortiz saw Davis behind Greisman. Ortiz saw a part of the gun that Davis was carrying, and he saw Davis stick his hand into the lunch cooler. Ortiz made eye contact with Davis while trying to help Greisman as well as make sure that Davis was not following them. Greisman walked back to his home, and Ortiz and Murray assisted him while awaiting the arrival of emergency help.

Evelyn Anderson, a Headley customer, arrived at Headley to pay her insurance bill during the time that the robbery was taking place. Anderson parked her sport utility vehicle in front of Headley, and her teenage granddaughter and infant grandson remained inside the vehicle. When Anderson tried to open the front door of the Headley building, she discovered that it was locked. Anderson walked to the side of the building to try and determine why she was unable to enter the building during normal business hours. While walking, she noticed that smoke was coming out of the building. Anderson also heard popping sounds, and shortly thereafter, Davis walked out of the building and placed the cooler under his arm. Anderson asked Davis what was happening. Davis continued walking away but responded that there was a fire in the building. Davis then walked to his vehicle, a black Nissan Altima, that was parked at a vacant house nearby. Davis got inside of the vehicle and drove away.[n.1]

> [N.1] Earlier that afternoon, Murray saw a black car sitting on a back street near a vacant house. After the robbery, she noticed that the car was not there. Additionally, Ortiz saw Davis walk away from the scene and towards the back of the vacant house. Ortiz also noticed a black Nissan that he had not seen parked in that location before. Ortiz saw

the Nissan being driven away, but he did not see the driver.

Shortly thereafter, Anderson came into contact with Bustamante. Anderson received a minor burn on her hand when she touched Bustamante, who was screaming for help and was severely burned. Bustamante walked towards Anderson's vehicle, and Anderson's granddaughter, who was seated in the front seat of the vehicle, ran away from the vehicle after seeing Bustamante's burning body. Bustamante walked to the open vehicle door and climbed inside the vehicle. Anderson encouraged Bustamante to get out of the vehicle because the paramedics were on the way. Bustamante got out of the vehicle and leaned on the hood.

By this time, Murray had finished attending to Greisman, and she returned to Headley to see if she could provide further help. Murray saw Bustamante leaning against Anderson's SUV. Murray described the scene as follows:

> She [Bustamante] was um, screaming she was hot. And that her skin was rolling off of her body at this time. It was disgusting. You could smell the burnt skin and flesh. And she was screaming she was really, really hot and she was thirsty. And so I ran across the street at that time to Havana Nights, which was a restaurant, a Cuban restaurant, across the street of Headley, off of the other corner of Phillips, and got a cup of ice water in a to go cup.

Murray returned to Bustamante with the cup of water, and Bustamante sipped from the cup while awaiting the arrival of emergency personnel. Murray talked with Bustamante, and Murray described their conversation as follows:

> I introduced myself as Fran and she introduced herself as Yvonne. We sat there talking a minute and she started to say—and I

gave her water. And, um, she said that she didn't understand how anybody would rob her, she didn't have any money. And that her kids, please pray, I'm not going to make this Fran. And I told her that I would get to the hospital if I could to see her, if it was allowed and that I would keep her in my prayers, that with God everything was possible. She wanted to talk about her children. And I cannot remember clearly if I asked her who did it, or if she was just talking. And she said that it was a black gentleman, and that he should be on video tape. She then started crying again and said she loved her babies very much, and she doesn't understand how anybody could do this to her.

Bustamante also told Murray that she had been bound with tape, doused with gasoline, pushed into a bathroom, and set on fire.

In the meantime, Luciano escaped the Headley building and ran to the nearby Havana Nights restaurant. The restaurant's owner, Jaidy Jiminez, heard a loud boom, and shortly thereafter, Luciano ran into the restaurant. Although Luciano was a Havana Nights customer, she was so badly burned that Jiminez did not recognize her: "I saw a woman that was naked, burned, um, burned from head to toe, no shoes on, or any clothes on, just underwear. But I couldn't recognize her."

Luciano asked for help and begged Jiminez to close the door because "he" was coming. Jiminez helped Luciano, whom she realized was pregnant, sit down. Additionally, other people inside the restaurant were trying to call 9-1-1 and to assist Luciano. Luciano asked what was taking so long for help to arrive and stated that she could not feel her baby moving. Jiminez tried to reassure her. It was during this time that Murray came into the restaurant asking for water, and Jiminez provided it to her. Jiminez walked outside the restaurant

to get help, and she saw the severely burned Bustamante. Once the paramedics arrived and began to assist Bustamante, Jiminez told them that another injured woman, Luciano, was inside of the restaurant.

*Emergency Personnel Response*

Emergency dispatches increased in their sense of urgency as the initial report of a fire gave way to additional reports of injuries and a shooting. Lt. Joe Elrod of the Lake Wales Police Department first encountered Greisman, who explained that he was shot while attempting to help a woman whom he heard screaming for help and soon discovered was on fire.

Lt. Elrod determined that Greisman's injuries were not life-threatening, and because emergency medical personnel were on the way to assist Greisman, he proceeded to the Headley building. When Lt. Elrod arrived at Headley, emergency medical personnel were already on the scene and were assisting Bustamante in the parking lot. Lt. Elrod observed Bustamante's severe burns, and he estimated that the burns covered about eighty percent of her body. Lt. Elrod immediately understood the gravity of Bustamante's injuries, and he decided not to wait until later to obtain Bustamante's statement. Lt. Elrod testified: "I knew she was going to die, so I tried to get information from her on who did it to her." "I asked her who did it to her. And she told me it was Leon Davis. And then I asked her, how she knew him. And she said that she knows him and that he was [a] prior client of theirs in the Insurance Company." Bustamante explained that Davis tried to rob them, and when they did not give him money, he threw gasoline on them and set them on fire. When they tried to run, Davis continued to throw gasoline on them.

Lt. Elrod then located Luciano inside of the Havana Nights restaurant. When he walked inside the restaurant, he saw Luciano, who was "obviously pregnant," sitting down. Lt. Elrod characterized Luciano's burn injuries as even worse than

Bustamante's. Lt. Elrod went outside and told emergency personnel that another victim needed help who was in even worse condition than Bustamante. He then began dispatching the name "Leon Davis" to law enforcement and conducting routine duties at the crime scene.

Paramedic John "Chip" Johnson and emergency medical technician Ernest Froehlich were the first emergency medical personnel to arrive on the scene. Upon arrival, they first saw Bustamante, who was in the parking lot and leaning on Anderson's SUV. Johnson observed: "the skin, everywhere I could see it, it was peeling back, and she had suffered major burns. Also she had darkened hands, and a further injury to her left hand, [t]hat was my observations at that time." Froehlich testified that Bustamante "looked like she had burns all over her body, hair singed off, most of her clothing was burned off, skin was hanging off her back and buttocks."

Froehlich was present when Lt. Elrod asked Bustamante if she knew who the perpetrator was, and he overheard Bustamante say "Leon Davis." Johnson also heard Bustamante state that Davis was the perpetrator, although he was unable to clearly hear Bustamante say Davis's first name. Anderson also heard Bustamante identify Davis as the perpetrator.

After initially assisting Bustamante, Johnson went to Havana Nights to assist Luciano. When Johnson entered the restaurant, he noticed water on the floor and saw Luciano, who was severely burned and "basically naked." There was a plastic substance on her wrists, neck area, and feet. Luciano, who was conscious, breathing, and able to talk clearly, told Johnson that she was pregnant and that while working in her office, someone poured gasoline on her and set her on fire. Luciano also told Johnson that her wrists were burning, and Johnson went to the ambulance to get sterile water to alleviate her pain.

By this time, additional emergency medical personnel were dispatched to the scene. Upon arrival,

paramedic George Bailey assumed primary responsibility for Luciano's care, and Johnson went back to the parking lot to continue assisting Bustamante. Luciano was conscious and able to respond to questions. She explained to Bailey "that there had been a robbery, at the business where she was at, she had been tied up or bound with tape, and had gasoline poured on her and had been lit on fire." Bailey did not ask her who harmed her, but Luciano told him that the person was a man and that she knew who it was. Luciano also told Bailey that she was twenty-four weeks pregnant. Bailey estimated that eighty percent of Luciano's body was burned with second- and third-degree burns.

Both Bustamante and Luciano were airlifted to the Orlando Regional Medical Center for treatment in the burn unit. Luciano underwent an emergency caesarean section, during which she gave birth to her son, Michael Bustamante, Jr.[n.2] Although detectives went to the hospital in hopes of interviewing Bustamante and Luciano, the severity of their injuries prevented the detectives from ever meeting with them.

> [N.2] Yvonne Bustamante's brother, Michael Bustamante, was in a relationship with Luciano and was the father of baby Michael.

Michael lived for three days after his emergency delivery. He died as the result of extreme prematurity. Bustamante lived for five days, and Luciano lived for three weeks. Autopsies of both women revealed that they died from complications of thermal burns due to the fire. According to the medical examiner, Bustamante suffered burns that covered eighty to ninety percent of her body. Luciano suffered burns that covered about ninety percent of her body. Additionally, the autopsy of Bustamante revealed bullet fragments from the gunshot to her left hand, although the gunshot was not a cause of her death.

*Events after the Robbery*

After leaving the scene, Davis went to a branch of the Mid Florida Credit Union, where he was an established customer. At 4:19 p.m., less than forty-five minutes after the alarm was activated at Headley, Davis walked into the credit union to make a cash deposit. Jessica Lacy, the teller who assisted Davis, was familiar with him as a customer and knew Davis by name. Davis deposited $148 in cash into his account that previously had a balance of $5.33. While processing Davis's transaction, Lacy observed that Davis's face was bloody and appeared to have scratches and marks on the nose, lip, and chin. The credit union branch manager, Valerie Dollison, was also working that afternoon. She did not personally know Davis, but she heard someone call him "Leon."

Davis also went to the house where his brother, Garrion Davis (Garrion), and Garrion's girlfriend, Melissa Sellers, resided.[n.3] Garrion testified that on the afternoon of December 13, "my brother came to my house. He wanted to—he needed some soap to wash his face. And he went outside my house and washed his face. I noticed he had a scratch on his face. He told me he had robbed somebody." Garrion testified that Davis also came inside the house and took a shower. Garrion estimated that Davis was at the house for ten to fifteen minutes.

[N.3] By the time of trial, Sellers and Garrion were married.

Sellers, who was at home with Garrion at the time, testified about Davis's visit to their house that afternoon. Sellers wished Davis, whose birthday was the next day, a happy early birthday. She estimated that Davis was at her house for ten minutes or less, and although she was not certain whether he had taken a shower, she knew that he had been in their bathroom. When Davis left, Sellers observed that Garrion's demeanor had changed. Garrion seemed upset and was teary-eyed.

Later, Davis went to a friend's home, where he used the cell phone of a woman named Fonda Roberts. Roberts was unable to hear Davis's conversation, which lasted a couple of minutes. When Davis was finished using the phone, he started to hand the phone to Roberts and then pulled it back from her. Davis then erased the number that he called. Roberts observed that at the time, Davis was driving a black vehicle.

*Davis Turns Himself In*

As the afternoon progressed, a massive investigation began. Davis's photograph was shown on television as media began to report the events at Headley, and Davis's family and friends became increasingly aware of Davis's status as a suspect in the day's events. Davis's family and friends frantically began trying to locate him in hopes that they could convince him to turn himself in safely.

That evening, Davis called his sister, Noniece DeCosey, and asked her to come and pick him up near a McDonald's. Their mother, Linda Davis, accompanied DeCosey to meet Davis. DeCosey drove them to a Circle K convenience store to meet Davis's and DeCosey's other sister, India Owens, and family friend Barry Gaston. Upon arrival, Davis walked up to Gaston, hugged him, and said: "I hurt someone." When Gaston asked Davis what he did, Davis said that he did not know. Davis and his mother got into a car with Owens and Gaston.

Gaston, a former law enforcement officer, helped facilitate Davis turning himself in at the Polk County Sheriff's substation. Gaston testified that on the way to the substation, Davis laid his head on his mother's lap in the backseat of the car and cried and sobbed. Davis again said that he hurt somebody, but Gaston told him not to say anything more. Davis was turned over to the Polk County Sheriff's Office without incident. Davis was later transported from the Sheriff's Office substation to the Bartow Air Base for further processing.

A number of people with whom Davis came into contact later in the day testified at trial that Davis appeared to have some sort of injury to his nose. The crime scene technician who photographed Davis after he was taken into custody and a law enforcement officer who interacted with Davis upon his transfer to the Bartow Air Base both testified that Davis appeared to have either scratches or a burn on his nose. Additionally, Davis's sister, Noniece DeCosey, saw a red mark on Davis's nose that could have been a burn.

That night, a black Nissan Altima was found at the Lagoon nightclub in Winter Haven. Law enforcement officers were dispatched to the location, and the car was seized pending a warrant to search the car's interior. Searches conducted in the vicinity of where the car was located, in particular to look for a firearm, did not reveal any additional evidence. The following day, after the search warrant was signed, law enforcement conducted an interior search of the Altima. Davis's driver license was found inside the car.

Davis was later tried for three counts of first-degree murder (Bustamante, Luciano, and baby Michael), one count of attempted first-degree murder (Greisman), one count of armed robbery, and one count of first-degree arson.

*The Guilt Phase*

The State's theory at trial was that Davis, a man driven by mounting financial pressures, planned the robbery of Headley, a business with which he was familiar. Davis's business relationship with Headley dated back to 2004, and as reflected in various records, Davis's insurance needs were primarily handled by Bustamante. The State introduced evidence that established a timeline of events leading up to the robbery, including Davis's actions on the day of the robbery. A summary of this evidence follows.

In the months leading up to the robbery, Davis experienced increasing financial difficulty. Davis, who at

the time was married to his wife Victoria, was primarily responsible for the family obligations, including the mortgage payment on their home. At the time, Davis and his wife had two cars: a blue Nissan Maxima owned by Davis, and a black Nissan Altima owned by Victoria. Both vehicles were insured under policies written by Headley. In June 2007, during a visit to the Mid Florida Credit Union, Davis became aware that the amount of the automatic debit from his account for his insurance coverage had been increasing over time. Davis was also informed that his account was overdrawn and became irate.

Unable to afford insurance for both cars, Davis and Victoria removed the license plate from the Maxima, canceled the car's insurance policy, and relied solely on the Altima for transportation. The couple was also unable to afford cell phone service during this time. Victoria had been working, but she became pregnant and was forced to stop working because of pregnancy complications.

*Davis's Plan to Rob Headley*

Davis's plan to rob Headley began to coalesce in early December. By this time, the couple had reached the limits on their credit cards, and the mortgage payment was delinquent. One week before the robbery, Headley customer Virginia Vazquez saw Davis at Headley. She first saw Davis in the parking lot looking in the back of a black car. Then, Davis went inside and began talking with Bustamante. Vazquez and her husband waited inside the insurance agency for fifteen to twenty minutes before Bustamante finished talking with Davis. Vazquez later recognized Davis from news coverage as the person she saw during her visit to Headley.

Davis's preparation for the robbery also involved acquiring various items that he would need in order to carry out the robbery, including a gun and ammunition. On December 7, 2007, six days before the robbery, Davis went to visit his cousin, Randy Black. Davis told Black

- 14 -

that he needed a gun for personal protection because he was going to travel to Miami. Black owned two guns, including a recently purchased Dan Wesson .357 magnum revolver. Black showed Davis both guns, and Davis opted to purchase the .357 magnum for around $200. Black also gave Davis .38 caliber bullets which were compatible with the .357 magnum. Davis and Black fired the revolver, which was operating normally. Later, Davis showed his mother the revolver. Davis told her that he got the revolver from Black and that he and Black fired it.[n.4]

> [N.4] After Black realized that law enforcement was looking for Davis, he immediately contacted law enforcement to advise that he recently sold Davis a gun. Black also provided law enforcement with two .38 caliber bullets and the receipt documenting his original purchase of the gun.

### Davis's Actions on the Day of the Robbery

The evidence introduced at trial also established a detailed timeline of Davis's actions on the day of the robbery, which included a visit to Walmart to purchase supplies that he would use later that day. On the morning of December 13, Victoria Davis last saw her husband at about 6 a.m. Before 7 a.m., Davis took his son, who had spent the previous night with Davis and Victoria, home to the boy's mother, Dawn Henry. His son's birthday was that day.

Davis then went to the Lake Wales Walmart, where surveillance video and still photographs showed him making three separate purchases around 7 a.m. The first purchase included a cap, long-sleeved shirt, and soft, orange lunch cooler. Davis's second purchase was a pair of gloves, and the third purchase was a Bic cigarette lighter. All of the purchases were cash transactions.

While at Walmart, Davis spoke with the store manager, Mark Gammons, and a store employee, Jennifer DeBarros. Gammons testified that Davis

approached him and asked where gloves were located in the store. When Gammons saw Davis's picture on the news that evening, he realized that he had seen Davis in Walmart that morning. Walmart employee Jennifer DeBarros had known Davis for more than ten years and was a family friend. DeBarros testified that on the morning of December 13, she talked with Davis during his visit to Walmart. DeBarros talked with Davis about his son's birthday.

Some time after leaving Walmart, Davis drove to the home of his sister, India Owens. Davis then accompanied Owens to take her car for repairs and pick up a rental car. They later went to pick up some furniture, and they stopped at a restaurant for lunch. Davis seemed agitated while eating lunch.

Video surveillance showed that Davis left the restaurant at 1:38 p.m. Davis and Owens then delivered the furniture to Owens's house. During that time, Owens noticed that Davis began acting strangely, obsessively locking doors in the house. Davis also asked for a piece of duct tape but did not say why he needed it. A short time later, Davis left Owens's house. Although Davis's son had a birthday party at school that afternoon, Davis did not attend. Davis entered the Headley building sometime around 3 p.m.

*The Investigation*

In addition to evidence surrounding the events at Headley, their aftermath, and Davis's behavior leading up to and including the day of the robbery, the State introduced evidence regarding various aspects of the investigation.

The expansive crime scene investigation spanned several days, and the numerous crime scene photographs entered into evidence depicted a gruesome series of events that began inside the Headley building and continued outside. The exterior photographs depict[ed] the entrance to Headley, the parking lot, Anderson's vehicle, and the trail of bloody footprints and burnt skin

that led from the Headley building to Havana Nights. Anderson's SUV was smeared with blood on both sides of the hood and was marked by blood stains on the vehicle doors and in the passenger side interior.

The interior photographs captured the damage in various areas of the Headley building, including fire damage in the office area, the storage area, and the extensively damaged bathroom. Among the widespread fire damage to and debris in the Headley building, the interior crime scene photographs revealed the presence of blood, a severely burnt chair, two cigarette lighters (one of which was identified as a Bic lighter), burnt duct tape, a burnt plastic gasoline can, an open cash box that contained only coins, an open and empty safe, a bloody alarm key pad, and burnt surveillance equipment. The photographs also showed bullet holes in a wall, a door, and an exterior shed door. A bullet was retrieved from the shed floor.

Detective Jeff Batz, an arson investigator, detected the odor of gasoline inside the Headley building, and noted that it was particularly strong near the rear of the building. Batz identified three areas of fire origin inside the Headley building: a chair located near the front door, the storage room, and the bathroom. Batz testified as follows: "Three-points of origin, separate in nature[,] neither one of them had connections with each other, directly through flame impingement. They all started with an open flame type device and accelerant was used on all three areas."

The investigation also included an examination of the seized Nissan Altima. When the car's floor mats were analyzed for the presence of an accelerant, a certified accelerant detection K-9 alerted to the presence of accelerant on the driver's floor mat and the passenger rear floor mat.

Several days after the robbery, a search warrant was executed at Davis's home. Although trial testimony revealed that Davis was responsible for the yard work at his home and that he kept a lawn mower and a gasoline

can in the garage, law enforcement located only the lawn mower. No gasoline can was found at Davis's home.

The gun used in the Headley crimes was never recovered. However, the rifling characteristics of the projectiles retrieved from the crime scene and from Bustamante's hand were determined to be consistent with the rifling characteristics of handgun manufacturer Dan Wesson, the manufacturer of the .357 magnum revolver that Davis bought several days before the robbery.

*Id.* at 147-55 (several alterations in original).

The jury convicted Davis of three counts of first-degree murder, one count of attempted first-degree murder, one count of armed robbery, and one count of first-degree arson. *Id.* at 155. The trial proceeded to the penalty phase, at the conclusion of which the jury unanimously recommended that Davis be sentenced to death for the murders of Bustamante and Luciano. *Id.* at 156. The jury also recommended by a vote of eight to four that Davis be sentenced to death for the murder of Luciano's infant son, Michael. *Id.*

The circuit court ultimately sentenced Davis to death for the murders of Bustamante and Luciano. *Id.* at 157. Six aggravating circumstances were found as to the murders of both women: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation (some weight); (2) the capital felony

- 18 -

was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); (3) the defendant was contemporaneously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); (4) the capital felony was committed while the defendant was engaged in the commission of, or attempt to commit, or in flight after committing or attempting to commit any robbery or arson (moderate weight); (5) the capital felony was committed for pecuniary gain (little weight); and (6) the capital felony was especially heinous, atrocious, or cruel (HAC) (great weight). *Id.* A seventh aggravating circumstance applied to the murder of Bustamante; the felony was committed for the purpose of avoiding or preventing a lawful arrest (some weight). *Id.* This aggravating circumstance was also considered with respect to the murder of Luciano but was rejected as not proven. *Id.*

Two statutory mitigating circumstances were considered: (1) no significant prior criminal history (rejected as not proven due to Davis's prior felony convictions); and (2) the murders were committed while Davis was under the influence of extreme mental

- 19 -

or emotional disturbance (little weight). *Id.* Fifteen nonstatutory mitigating circumstances were proven and assigned varying weights: (1) the defendant was the victim of bullying throughout his childhood (slight to moderate weight); (2) the defendant was the victim of sexual assault as a child (slight to moderate weight); (3) the defendant was the victim of both physical and emotional child abuse by a caretaker (moderate weight); (4) the defendant was the victim of overall family dynamics (very little weight); (5) the defendant served in the United States Marine Corps (very little weight); (6) the defendant had a history of being suicidal, both as a child and as an adult (slight weight); (7) the defendant was diagnosed with a personality disorder (slight weight); (8) the defendant had a history of depression (slight weight); (9) the stress the defendant was dealing with at the time of the incident (little weight); (10) the defendant was a good person in general (very slight weight); (11) the defendant was a good worker (very slight weight); (12) the defendant was a good son, good sibling, and good husband (very slight weight); (13) the defendant was a good father to a child with Down Syndrome (moderate weight); (14) the defendant exhibited good behavior during the trial and other court

proceedings (very slight weight); and (15) the defendant exhibited good behavior while in jail (little weight). *Id.*

The trial court overrode the jury's eight to four recommendation of death for the murder of Michael and imposed a sentence of life imprisonment. *Id.* at 157-58. The record also indicates that Davis was sentenced to life imprisonment for the attempted first-degree murder of Greisman, life imprisonment for armed robbery, and thirty years of imprisonment for arson.

## DIRECT APPEAL

On direct appeal, Davis raised four issues: (1) whether the statements of victim Bustamante were properly admitted under the dying declaration hearsay exception; (2) whether certain identifications of Davis made from a photopack (or photographic lineup) should have been excluded; (3) whether Davis was unfairly prejudiced by the admission of photographs of the murder victims; and (4) whether the trial court improperly found the avoid arrest aggravating factor as to the murder of Bustamante. *Id.* at 158. This Court affirmed Davis's convictions and sentences. *Id.* at 175.

## INITIAL 3.851 PROCEEDING

Davis timely filed his initial 3.851 motion for postconviction relief raising twenty-two claims.[1] In August 2021, the circuit court

---

1.  Davis's Headley postconviction motion raised the following claims: (1) trial counsel failed to move to dismiss the indictment based on the grand jury's failure to find the elements needed to charge a capital felony; (2) trial counsel failed to move to bar the State from seeking the death penalty when there is no allegation of aggravators in the indictment; (3) trial counsel failed to seek to bar prosecution of this case on a felony murder theory when the grand jury only found the elements of first-degree premeditated murder; (4) trial counsel failed to seek a change of venue for the jury trial in this case given its notoriety; (5) trial counsel failed to object to, and in fact participated in, comments by the trial court that the photographs of the deceased shown to the venire during jury selection were the worst they have seen; (6) trial counsel failed to object to the trial court's vouching for the Office of the State Attorney when he said to the jury that the State does not seek death in every first-degree murder case; (7) trial counsel failed to engage in a case-specific voir dire as described in the American Bar Association guidelines and in not objecting to the trial court's admonition to the jury that they should start with a "neutral" perspective if there is a penalty phase; (8) trial counsel failed to aggressively litigate a motion to suppress based on a key false statement in the affidavit for search warrant; (9) trial counsel failed to cross-examine the State's witnesses about the crime scene in a way that would show that the physical evidence supported a verdict of second-degree murder; to engage in cross-examination in a way that would demonstrate the State withheld and/or lost and/or destroyed evidence in a way that made it impossible for Davis to fight the charge made by the State; to cross-examine in a way that would reveal failure by the fire marshal to follow proper laboratory protocols; and to develop important evidence; (10) trial counsel failed to seek a special instruction on circumstantial evidence; (11) trial counsel failed to seek a special instruction on dying

held a two-day evidentiary hearing that addressed Davis's Headley and BP postconviction motions. As to the Headley postconviction motion, the trial court granted an evidentiary hearing on several of Davis's claims of ineffective assistance of counsel: claim 4 (failure to seek a change of venue); claim 5 (failure to object to certain trial

declarations; (12) trial counsel failed to argue case law from the Florida Supreme Court in conflict with its own holding on the issue of admitting photographs of the deceased; (13) trial counsel failed to argue that aggravators should be tried in the "guilt" phase of the trial because the aggravators transform first-degree murder into a capital offense; (14) trial counsel failed to argue that the maximum sentence allowed under the jury's verdict was life; (15) trial counsel failed to insist on an instruction regarding a presumption that a life sentence is appropriate in the absence of proof beyond a reasonable doubt; (16) trial counsel failed to argue that the execution process itself meets the Florida Supreme Court's definition of especially heinous, atrocious, and cruel and that therefore, Davis's sentence violates the Eighth Amendment and the Florida Constitution's prohibition against cruel and unusual punishment; (17) trial counsel failed to thoroughly investigate Davis's background and present social history and mental health mitigation, and as a result Davis's waiver of a mental health evaluation cannot be knowing, intelligent, and voluntary; (18) trial counsel failed to ensure a comprehensive presentence investigation (PSI) report or provide all mitigation evidence in his possession to the court prior to sentencing; (19) trial counsel failed to aggressively litigate a motion to suppress based on a stale search warrant pursuant to section 933.05, Florida Statutes; (20) trial counsel failed to show through the available evidence that the State's hypothesis of prosecution was critically flawed; (21) trial counsel failed to file a motion to suppress the Greisman photopack based upon chain of custody violations; and (22) cumulative error.

- 23 -

court comments); claim 7 (failure to ask certain voir dire questions and object to trial court comment); claim 17 (failure to thoroughly investigate Davis's background and present social history and mental health mitigation); and claim 18 (failure to ensure a comprehensive PSI report or provide all mitigation to the trial court before sentencing). Portions of claim 17, relating to counsel's investigation and presentation of mental health mitigation, were dismissed after the court held a hearing on the State's motion to strike the presentation of all mental health evidence at the evidentiary hearing. Lead defense counsel Robert Norgard, who was Davis's lead counsel during the Headley and BP trials, testified at the evidentiary hearing. The appellant also provided brief testimony.[2] The circuit court ultimately denied relief on all claims.

Davis now appeals the order denying postconviction relief and petitions for a writ of habeas corpus.

---

2. Additional witnesses testified at the evidentiary hearing, but their testimony was relevant to claims raised in Davis's BP postconviction motion.

# POSTCONVICTION APPEAL

Davis raises eight issues in his postconviction appeal. Specifically, he argues six claims of ineffective assistance of trial counsel, claims cumulative error, and contends that the circuit court erred by not ordering that he be evaluated for competency before the evidentiary hearing. We address each issue in turn and explain why he is not entitled to relief.

Our analysis of Davis's claims of ineffective assistance of counsel is governed by the standard set forth in the United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). This Court has explained:

> First, counsel's performance must be shown to be deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. *Id.* When examining counsel's performance, an objective standard of reasonableness applies, *id.* at 688, and great deference is given to counsel's performance. *Id.* at 689. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel." *See Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong presumption that trial counsel's performance was not ineffective. *See Strickland*, 466 U.S. at 669.

Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. *Strickland*, 466 U.S. at 689. A defendant must do more than speculate that an error affected the outcome. *Id.* at 693. Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Both deficient performance and prejudice must be shown. *Id.* Because both prongs of the *Strickland* test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo.

*Sheppard v. State*, 338 So. 3d 803, 816 (Fla. 2022) (quoting *Bradley v. State*, 33 So. 3d 664, 671-72 (Fla. 2010)). "Because *Strickland* requires a defendant to establish both prongs, if one prong is not met, the Court need not reach the other." *See id.* (citing *Stewart v. State*, 801 So. 2d 59, 65 (Fla. 2001)).

## I. Change of Venue

Davis challenges the circuit court's denial of his claim that trial counsel was ineffective (1) for failing to move for a change of venue, and (2) for filing a motion to keep the trial in Polk County after a mistrial was declared during the first trial. Davis maintains that counsel wanted the trial to remain in Polk County because

moving the trial to another county would have required counsel to make alternate childcare arrangements. Davis alleges that counsel's childcare concerns were prioritized over the need for a change of venue. The circuit court properly denied this claim.

First, while Davis's appellate briefs emphasize the pretrial publicity that occurred in this triple homicide case, we are mindful that "pretrial publicity is normal and expected in certain kinds of cases, and that fact standing alone will not require a change of venue." *Griffin v. State*, 866 So. 2d 1, 12 (Fla. 2003) (citing *Rolling v. State*, 695 So. 2d 278, 285 (Fla. 1997)).

Second, Davis has not demonstrated deficient performance. In *Rolling v. State*, 825 So. 2d 293, 301 (Fla. 2002), in rejecting the appellant's claim that counsel's venue strategy constituted ineffective assistance, we noted the deference that applies to counsel's strategic decisions:

> Although attorneys may differ as to venue strategy, we agree with the trial court's conclusion that the decision in this case has not been demonstrated to have fallen outside the wide range of reasonable professional assistance. *See Weeks v. Jones*, 26 F.3d 1030, 1044 n.13 (11th Cir. 1994) (noting that counsel's strategic decision not to seek a change of venue based upon his experience in that county was the type of decision the Supreme Court cautioned courts about questioning); *see*

*also Cox v. Norris*, 133 F.3d 565, 573 (8th Cir. 1997) (holding that counsel's tactical decision not to seek a venue change was reasonable because he believed other counties were prone to harsher sentences); *Huls v. Lockhart*, 958 F.2d 212, 214-15 (8th Cir. 1992) (concluding that trial counsel were not ineffective for failing to seek a change of venue where counsel considered among other things their familiarity with the county where case was to be tried).

At the evidentiary hearing, Davis's counsel testified about his lengthy practice history in Polk County, and his familiarity with and understanding of the county's residents. He explained that he made a strategic decision not to pursue a change of venue and preferred to try the case in Polk County because of his extensive practice experience there. However, counsel explained, he remained aware that he could have moved for a change of venue during jury selection if selecting a jury in Polk County had proven difficult.

In denying this postconviction claim, the circuit court noted that Davis's claim consisted of "speculation and conjecture," and that counsel offered "sound strategic reasons for wanting to keep the trial in Polk County for the second trial."

We agree with the circuit court. Similar to *Rolling*, where "[t]rial counsel's decision was informed by years of experience with

- 28 -

Alachua County juries in capital and noncapital cases," counsel's decision here was informed by decades of trial experience in Polk County. *Id.* Counsel's performance was not deficient.

While Davis's failure to show deficient performance is determinative of this ineffective assistance claim, we address the prejudice prong given that the trial court itself discussed whether a change of venue might be needed after Davis's first trial resulted in a mistrial. To prove prejudice with respect to a change of venue, "the defendant must, at a minimum, 'bring forth evidence demonstrating that the trial court would have, or at least should have, granted a motion for change of venue if [defense] counsel had presented such a motion to the court.'" *Dillbeck v. State*, 964 So. 2d 95, 104 (Fla. 2007) (alteration in original) (quoting *Wike v. State*, 813 So. 2d 12, 18 (Fla. 2002)).

Davis's prejudice argument fails because he has not shown that the trial court would or should have granted a motion for change of venue. In *Griffin*, the trial court considered the need for a change of venue, explaining "that [the court] had already made alternate arrangements if it proved impossible to choose a fair and impartial jury in Dade County." 866 So. 2d at 12. However,

counsel did not move for a change of venue. *Id.* This Court rejected Griffin's ineffective assistance of counsel claim, observing that "there was little difficulty in selecting an impartial jury," and thus, no reasonable probability that a change of venue motion would have been granted. *Id.* at 13. Where the record is clear that there was no difficulty in selecting a jury, the mere fact that the trial court considered the possibility of a change of venue does not establish prejudice.

As was the case in *Griffin*, the parties here were able to select a jury without difficulty, and as a result, counsel did not deem a change of venue necessary. There is no error in the circuit court's denial of this ineffective assistance claim, and Davis is not entitled to relief.

## II. Trial Court Comments

Davis also argues that counsel was ineffective for failing to object to certain comments made by the trial court during jury selection and that the circuit court erred in denying this claim. Davis maintains that counsel should have objected to the trial court's comments relating to graphic photographs of the victims

and the State's pursuit of the death penalty in other cases.

However, Davis has not shown that counsel was ineffective.

## A. Victim Photographs

Davis's postconviction motion alleged that (1) the trial court improperly commented to prospective jurors that the photographs of the deceased victims were the worst that the court had seen, and (2) counsel was ineffective for failing to object to the court's statements. These assertions are without merit.

During jury selection, one photograph of each deceased victim was shown to the jury. Before doing so, the trial court explained to the group of prospective jurors that the photographs were extremely graphic:

> This case is truly not for the faint of heart. The photographs alone in this case are graphic.
> For the last three and a half years, I have handled all of the first-degree murder cases in this circuit, and I have been doing this for 16 years, so I have seen a lot in my service on the bench. And I typically tell jurors that you are going to see photographs, because in every homicide case, the jury is shown photographs of the crime scene and they are typically shown photographs from an autopsy, where a medical examiner performs an autopsy on the victim, and I tell people typically that yes, you may see some blood and it is not something you particularly want to look at, but it is no worse than you probably see on television any more. As you will know, between movies and television, it's become so graphic

that I don't see jurors shocked as maybe 10 or 15 years ago. These photographs are graphic.

There are some people, and I don't fault you if you fall in this category, but there are some folks that may not be able to handle the emotional aspect of this case and the graphic nature of this case.

I don't normally give this kind of presentation for my other cases, we just simply tell folks there may be some semi-graphic photographs, if you have a weak stomach, let us know, we'll talk about it. But I don't do it quite like we're doing this.

And the reason I'm doing this, I don't want to pick a jury, and you see how much time we're spending to get this done correctly, and then the first day that you are shown photographs, one of you absolutely can't take it and emotionally and I have lost a juror or two or three.

The trial court's comments did not describe the photographs as "the worst" relative to other cases. While the court did comment on the graphic nature of the photographs, the full context demonstrates that the court was stressing to the prospective jurors the importance of providing candid responses when they were individually shown photographs of the victims.

Moreover, counsel discussed his rationale for not objecting to the court's comments. In cases such as Davis's, involving emotional aspects such as graphic victim photographs or a deceased child—and in this case, both—counsel explained that his strategy is to desensitize the jury as much as possible before the

- 32 -

presentation of evidence begins and exclude any jurors who would be especially affected by viewing graphic photographs. Counsel's failure to object to the court's comments did not constitute deficient performance, and we affirm the circuit court's ruling.

## B. Vouching for the State

Davis also takes exception with the trial court's comments to potential jurors that the death penalty is not appropriate for all first-degree murders and that the State does not always seek the death penalty. Davis characterizes these comments as improperly vouching for the State and suggesting that he deserved the death penalty. The circuit court summarily rejected Davis's claim that counsel was ineffective for failing to object to the court's comments. We agree with the court's ruling.

"To be entitled to an evidentiary hearing on a claim of ineffective assistance, the defendant must allege specific facts that are not conclusively rebutted by the record and which demonstrate a deficiency in performance that prejudiced the defendant." *Jones v. State*, 845 So. 2d 55, 65 (Fla. 2003). "Failure to sufficiently allege both prongs results in a summary denial of the claim." *Spera v.*

*State*, 971 So. 2d 754, 758 (Fla. 2007) (citing *Thompson v. State*,

796 So. 2d 511, 514 n.5 (Fla. 2001)).

The record does not support Davis's characterization of the

trial court's comments.  In context, the court said:

> We're going to talk to you about two issues in private.  And that is whether you know anything about the case from having seen it in the media in whatever form.  Or whether you know people involved and have heard about it and so on.  The other thing we're going to talk about is your views on the death penalty.  Without a doubt the most difficult issue we ask judges and jurors to decide is the issue of capital punishment.  The State of Florida has a statutory procedure set up in dealing with this.  And I read to you the bifurcated instruction, but it starts very simply, and that is the State must put someone on notice of seeking the death penalty.  The death penalty is not appropriate in all First Degree Murder cases, and the State does not seek it in all First Degree Murder cases.  Once that occurs, if the Defendant is found guilty of First Degree Murder, and First Degree Murder only, not some lesser.  If the Defendant is found guilty of some lesser crime or found not guilty then your job is done.  If and only if the Defendant is found guilty of First Degree Murder do you then start considering the issue of penalty.

Concluding that the trial court's comments were not

objectionable and that as a result, counsel could not have been

ineffective for failing to object, the circuit court stated: "[I]t is clear

this was not a comment on the Office of the State Attorney or their

decision on the severity of this case.  The purpose of this comment

- 34 -

was to inform jurors they would be questioned in private regarding their ability to serve in this particular case. The comments were true statements of fact, and not misleading."

As the circuit court concluded, the trial court's comments did not suggest that Davis was more deserving of the death penalty than other capital defendants. To the contrary, the trial court emphasized the jury's role in determining whether Davis was guilty and explained that the jury would only reach deliberations on the death penalty if it first found Davis guilty of first-degree murder. Counsel's failure to object was not deficient, and thus, Davis cannot demonstrate prejudice.

Having failed to meet his burden for entitlement to an evidentiary hearing on this issue, Davis is not entitled to relief.

### III. Voir Dire Questions

Davis also contends that counsel was ineffective for failing to ask case-specific questions to prospective jurors during voir dire and that counsel failed to satisfy the American Bar Association (ABA) guidelines for jury selection in capital cases. In his postconviction motion, Davis argued that counsel failed to ask prospective jurors eighteen specific questions. An evidentiary

hearing was granted on this claim, during which Davis focused on five of the eighteen questions:

> 1) Based on the pictures of the deceased you were shown earlier—if we were to reach the penalty phase, could you entertain the possibility [that] the time Ms. Bustamante and Ms. Luciano spent in pain was relatively short?

When asked why he did not ask prospective jurors this question, counsel explained that this question would have required him to delve into the facts of the case more deeply than is appropriate during jury selection. Counsel also noted that while addressing the HAC aggravating factor during the penalty phase, he emphasized the evidence that the victims could have felt less pain because their nerve endings were damaged due to the burns.

> 2) Does the death of an unborn fetus/child affect your ability to be fair and impartial[?]

Counsel testified that he did not find it necessary to ask this question because the prospective jurors had been informed that this case involved the death of a child.

> 3) Given the injuries you observed in the photos shown to you earlier in jury selection is there any set of mitigating circumstances you could ever hear that would outweigh what you observed in those photographs?

Counsel explained that this question would have been unnecessary in light of prospective jurors' statements that they could be fair and impartial. He also observed that delving into specific mitigating circumstances during jury selection might require addressing more detailed facts than was permissible at that stage of the proceedings.

> 4) It has been put forth that the photos, and thus this case, is the worst any of the court personnel have seen—do you understand you have to completely put that out of your mind in deciding these cases? Are you in fact able to put those comments out of your mind?

Counsel recalled that concerns about the graphic victim photographs arose during an individual voir dire but stated that he would not have asked this question of the entire group.

> 5) If you were to find Mr. Davis guilty of First Degree Murder and that the basic facts outlined by the judge earlier were the result of Mr. Davis's actions—could you begin the sentencing phase presuming Mr. Davis was entitled to a life sentence?

Counsel testified that he would never ask a prospective juror a question that presumes a defendant's guilt and that he would never, even hypothetically, ask a jury to consider a defendant guilty. He noted that although some attorneys concede a client's guilt for the purpose of the penalty phase, he did not concede Davis's guilt. Additionally, counsel noted that he focused on the

guilt phase during jury selection, and he did not want to spend too much time discussing the death penalty because he did not want to send a message to prospective jurors that he expected the trial to get to the penalty phase.

Davis has not established that counsel's performance was deficient. Counsel provided specific, strategic reasons why he did not ask the questions that Davis identified, and Davis has not established that counsel's strategy was unreasonable.

Moreover, Davis's reliance on the ABA's jury selection guidelines does not further his claim that counsel was ineffective. The circuit court properly observed that "[t]he ABA Guidelines are not a set of rules constitutionally mandated under the Sixth Amendment and that govern the Court's *Strickland* analysis. . . . To hold otherwise would effectively revoke the presumption that trial counsel's actions, based upon strategic decisions, are reasonable . . . . *Mendoza v. State*, 87 So. 3d 644, 653 (Fla. 2011)." We affirm the circuit court's ruling.

### IV. Photopack

Davis argues that counsel was ineffective for failing to challenge the chain of custody of the photopack from which

attempted murder victim Greisman identified Davis as the person who shot him. He contends that counsel should have moved to suppress the photopack on chain of custody grounds and that the circuit court should have granted an evidentiary hearing on this claim. The circuit court did not err in summarily denying Davis's claim.[3]

Counsel was not deficient for failing to file a motion to suppress based on a chain of custody argument, and even if counsel had done so, Davis was not entitled to relief. The record reveals that the day after Greisman was shot, he was released from the hospital and went to meet with detectives at the Lake Wales Police Department. There, while meeting with Officer Lynette Townsel, Greisman viewed a photopack of possible suspects.

---

3. The same photopack was a part of a limited amount of Headley evidence that was admitted during the BP trial because it was also relevant to identifying Davis as the BP shooter. While the circuit court did not grant an evidentiary hearing on Davis's claim of ineffective assistance of counsel with respect to the photopack in the present case (the Headley case), the court did grant an evidentiary hearing on Davis's *Giglio v. United States*, 405 U.S. 150 (1972), and *Brady v. Maryland*, 373 U.S. 83 (1963), claims in the BP case, which were also based on the State's handling of the photopack.

Greisman identified Davis from the photopack and placed his initials next to Davis's photo.

Before trial, defense counsel moved to suppress (1) the photopack on the grounds that it was unnecessarily suggestive, and (2) Greisman's in-court identification of Davis. The trial court denied both motions. The photopack was admitted at trial, and both Greisman and Officer Townsel testified at trial as to its authenticity.[4]

However, a part of Officer Townsel's trial testimony involved her handling of the photopack after Greisman viewed it and identified Davis. In 2010, during a pretrial review of the evidence in the case, it was determined that Officer Townsel had not placed the photopack in evidence storage per standard procedure. She testified that following an extensive search for the photopack, she found the photopack in a storage shed at her home where she had kept her own working files with copies of case documents. Given that the photopack was not properly stored in evidence storage,

---

4. In a detailed discussion on direct appeal, this Court affirmed the trial court's orders denying the motions to suppress. *See Davis*, 207 So. 3d at 166-69.

Davis alleges that the photopack was tampered with and argues that defense counsel should have moved to suppress the photopack due to a broken chain of custody.

In order to suppress the photopack based on a faulty chain of custody, Davis would have been required to establish probable tampering. *See Peek v. State*, 395 So. 2d 492, 495 (Fla. 1980) ("Relevant physical evidence is admissible unless there is an indication of probable tampering."). The circuit court determined that the record conclusively rebutted Davis's chain of custody claim and that the claims of tampering were speculative:

> Clearly, Officer Townsel did not follow the proper procedure by failing to enter the photo pack securely in evidence immediately after Mr. Greisman made the identification. However, Mr. Davis has offered only speculation that the location of the photo pack prior to being placed into evidence resulted in tampering. Such bare allegations are insufficient to render the evidence inadmissible. *See Terry v. State*, 668 So. 2d 954, n.4 (Fla. 1996); *Bush v. State*, 543 So. 2d 283, 284 (Fla. 2d DCA 1989). Instead, the testimony from Officer Townsel and Mr. Greisman reflect[s] that no tampering occurred during the time the photo pack was in Officer Townsel's shed.

The circuit court did not err in summarily denying Davis's claim that counsel was ineffective for failing to file a motion to

suppress to challenge the chain of custody of the photopack.  We affirm the circuit court's ruling.

## V. Nissan Altima

Davis argues that counsel was ineffective for failing to aggressively litigate a motion to suppress evidence retrieved from Victoria Davis's Nissan Altima and that this claim warranted an evidentiary hearing.  The day after the incident at Headley, a search warrant for the Nissan Altima was signed and executed.  Multiple pieces of evidence were retrieved, including driver and rear passenger floormats that tested positive for the presence of gasoline.  Before trial, counsel filed a motion to suppress evidence seized from the car.  The motion asserted multiple grounds for suppression, including that the search warrant was stale and therefore invalid because the return on the warrant was not made until September 2008.  Following a suppression hearing, the trial court denied the motion.

Davis argues that counsel was ineffective for filing a skeletal motion to suppress and then abandoning it.  He maintains that had counsel more aggressively fought to suppress evidence seized from

the Nissan Altima, there is a reasonable probability that he would have been acquitted. However, Davis has not met his burden.

"[W]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious." *Zakrzewski v. State*, 866 So. 2d 688, 694 (Fla. 2003) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). Moreover, "even if a motion to suppress would have been granted, the defendant must show that there is a reasonable probability the result of the proceeding would have been different if not for counsel's error." *Sanchez-Torres v. State*, 322 So. 3d 15, 21 (Fla. 2020) (citing *Abdool v. State*, 220 So. 3d 1106, 1112 (Fla. 2017)).

As an initial matter, Davis has not shown that counsel's performance was deficient. Before trial, counsel filed a motion to suppress and was heard on the matter at a suppression hearing. Our review of the hearing transcript indicates that counsel did not, as Davis suggests, merely abandon the motion. Instead, counsel conceded that the law was not favorable to the defense's position with respect to the delayed return of the warrant, given that the

warrant itself was timely executed. *See State v. Featherstone*, 246 So. 2d 597, 599 (Fla. 3d DCA 1971) (concluding that the delayed return of a timely executed warrant did not render a warrant void, but acknowledging an exception where the defendant can demonstrate prejudice).

Thus, Davis has failed to establish a meritorious Fourth Amendment claim. However, even if the evidence obtained from the Altima had been suppressed, that evidence was only a part of that linking Davis to the Headley crimes. Multiple individuals testified that they heard Bustamante's dying declaration identifying Davis as the perpetrator. Gunshot victim Greisman identified Davis as the person who shot him. Eyewitness Ortiz also identified Davis as the person who shot Greisman, and he testified that he recognized Davis from a former worksite.

Davis also made incriminating statements to family members and a family friend. He also made several incriminating purchases, notably a firearm that had rifling characteristics consistent with the projectiles obtained at the Headley crime scene and from Bustamante's hand. The day of the incident, he purchased a lighter, as well as a cooler that he was seen putting a gun into after

he shot Greisman. A gasoline can was found at Headley, and the gasoline can normally kept at Davis's home was missing when the home was searched. Additionally, Davis made an account deposit at his bank shortly after the robbery at Headley, and his account previously had a very low balance.

Thus, Davis has not demonstrated that the outcome of his trial would have been different, and we affirm the circuit court's ruling.

### VI. Dashboard Camera Footage

Davis argues that he was entitled to an evidentiary hearing on his claim that counsel was ineffective for failing to present evidence creating reasonable doubt as to his guilt. In particular, he alleges that counsel failed to challenge the State regarding missing dashboard camera footage from the vehicle of one of the officers who responded to the Headley scene. The circuit court did not err in summarily denying this claim.

After the murders, Lake Wales Police Sergeant Griffin Crosby filed a supplemental report indicating that he retrieved dashboard camera footage from the police car of another officer who reported to the Headley scene. Sergeant Crosby's supplemental report read:

On 12/27/2007, I recovered the video hard drive from Officer Hampton's in-car video system. I then transferred the video images to the Digital Eyewitness Media Manager (DEMM). The server is secured with limited access. I then transferred the video images from the DEMM, to a Digital Video Disc (DVD). The disc was turned over to the Property/Evidence Custodian. At this time, I have no further information regarding this case.

The defense never obtained the video footage. On June 2, 2010, defense counsel deposed Sergeant Crosby, who indicated the following:

> [Officer Hampton's in-car video] just shows him pulling into the west side of the Headley parking lot. It shows the vehicle—I mean the building burning, and then you can see him run across the front of the screen. That's really about all it shows. And then, of course, you can see the firefighters and other personnel running around.

Davis argues that the footage could have been used to undermine the State's theory that he was the perpetrator, and especially to impeach Lieutenant Elrod's testimony about Bustamante's dying declaration identifying Davis.

However, the circuit court did not err in summarily denying Davis's speculative claim. Counsel deposed Sergeant Crosby and inquired about the DVD footage during the deposition. Based on the sergeant's testimony, the footage was extremely limited in scope. The sergeant described the limited nature of the footage and

provided no reasonable basis for concluding that the footage contained or would have produced evidence helpful to the defense. The testimony undermined Davis's conclusory allegation that the footage would have refuted the substantial evidence of his identity as the perpetrator. Notably, multiple eyewitnesses identified Davis, two of whom selected his photograph from photopacks shortly after the crimes. We affirm the circuit court's ruling.

## VII. Cumulative Error

Davis argues that the cumulative effect of counsel's alleged errors deprived him of a fundamentally fair trial and entitles him to relief. However, Davis "has not demonstrated error, deficiency, or prejudice as to any of his claims." *Covington v. State*, 348 So. 3d 456, 479 (Fla. 2022). As a result, his claim of cumulative error fails.

## VIII. Competency

Davis argues that the circuit court erred by not ordering that he be evaluated for competency before granting the State's motion to (1) dismiss portions of claim number seventeen in his postconviction motion and (2) exclude mental health evidence from the evidentiary hearing. He contends that the court's failure to

- 47 -

order a competency evaluation was primarily motivated "by the length of time Mr. Davis's case was on the docket, the state's sense of urgency in adhering to the schedule, and the judicial backlog created by the COVID pandemic." However, Davis's argument is without merit, as he has not demonstrated that there were reasonable grounds for the court to order a competency examination.

"The substantive standard for competence to proceed is 'whether the defendant has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and whether the defendant has a rational as well as factual understanding of the pending collateral proceedings.'" *Kocaker v. State*, 311 So. 3d 814, 820 (Fla. 2020) (quoting Fla. R. Crim. P. 3.851(g)(8)(A)). A postconviction court's determination of whether to order a competency examination is governed by Florida Rule of Criminal Procedure 3.851(g)(3), which provides:

> If, at any stage of a postconviction proceeding, the court determines that there are reasonable grounds to believe that a death-sentenced defendant is incompetent to proceed and that factual matters are at issue, the development or resolution of which require the defendant's input, a judicial determination of incompetency is required.

Although Davis cites multiple pages in the postconviction record as evidence "sufficient to create a 'bona fide doubt' regarding Mr. Davis's competency to proceed," not only does the record not create a bona fide doubt as to his competency, it contradicts Davis's claim.

Davis points to a record of a strained relationship with one of his former attorneys as evidence that he was entitled to a competency evaluation. Letters written by Davis and discussions at various hearings indicate that Davis disagreed with the attorney on multiple matters. These communications, though, reveal a very sophisticated defendant, familiar with the substance of *Giglio* claims and *Huff*[5] hearings, and well-informed about the motions filed on his behalf. For instance, Davis took exception with the wording of various claims and argued that the attorney was not pursuing meritorious claims. These behaviors do not create a bona fide doubt as to Davis's competence.

Moreover, the fact that Davis was indecisive about allowing his attorneys to pursue mental health claims does not substantiate his

5. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

claim that a competency examination was warranted. Because the court had no reasonable grounds to believe that Davis was incompetent to proceed, the circuit court did not err by not ordering a competency examination.

## PETITION FOR WRIT OF HABEAS CORPUS

Davis seeks habeas relief on the basis of ineffective assistance of appellate counsel. "In general, claims of ineffective assistance of appellate counsel are properly presented in a petition for writ of habeas corpus . . . ." *Brown v. State*, 304 So. 3d 243, 278 (Fla. 2020) (citing *Baker v. State*, 214 So. 3d 530, 536 (Fla. 2017)); *Wickham v. State*, 124 So. 3d 841, 863 (Fla. 2013). While the failure to raise unpreserved claims on appeal is not normally a basis for ineffective assistance of appellate counsel, the failure to raise unpreserved claims of fundamental error may be. *See Wickham*, 124 So. 3d at 863 (citing *Valle v. Moore*, 837 So. 2d 905, 907-08 (Fla. 2002)).

Here, Davis argues that appellate counsel was ineffective for failing to raise as fundamental error certain comments made by the trial court during jury selection. The comments, to which defense counsel did not object, related to the sampling of graphic victim

photographs shown to the jury and the State's discretion to not seek the death penalty in every first-degree murder prosecution.

However, this habeas claim is procedurally barred. The comments challenged here are identical to those raised in Davis's claim of ineffective assistance of trial counsel, discussed above in issue number two. Davis has simply repackaged one of his postconviction claims as a habeas claim, and "[d]efendants cannot relitigate the substance of postconviction claims in a habeas petition under the guise of ineffective assistance of appellate counsel." *Smith v. State*, 330 So. 3d 867, 893 (Fla. 2021); *see Calhoun v. State*, 312 So. 3d 826, 854 (Fla. 2019) (concluding that three habeas claims were procedurally barred because they were "permutations of claims" raised in the petitioner's postconviction motion); *Knight v. State*, 923 So. 2d 387, 395 (Fla. 2005) ("[C]laims [that] were raised in [a] postconviction motion . . . cannot be relitigated in a habeas petition."). Moreover, we concluded that Davis's postconviction claim is meritless. Therefore, Davis is not entitled to habeas relief.

## CONCLUSION

For these reasons, we affirm the circuit court's denial of postconviction relief, and we deny habeas relief.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, GROSSHANS, and FRANCIS, JJ., concur.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Polk County,
   Donald G. Jacobsen, Judge
   Case No. 532007CF00938601XXXX
And an Original Proceeding – Habeas Corpus

Robert Friedman, Capital Collateral Regional Counsel, Tallahassee, Florida, and Stacy R. Biggart, Special Assistant – Capital Collateral Regional Counsel, Northern Region, Gainesville, Florida,

   for Appellant/Petitioner

Ashley Moody, Attorney General, Tallahassee, Florida, and Marilyn Muir Beccue, Senior Assistant Attorney General, Tampa, Florida,

   for Appellee/Respondent